Filed 3/9/17; pub. & mod. order 4/6/17 (see end of opn.)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. FRANCISCO JOSE MARTINEZ et al., Defendants and Appellants. | D067052 (Super. Ct. No. SCD219673) |
| THE PEOPLE, Plaintiff and Respondent, v. MARCELLUS LOPES LEE, Defendant and Appellant. | D067561 (Super. Ct. No. SCD219673) |

CONSOLIDATED APPEALS from judgments of the Superior Court of San Diego County, Peter C. Deddeh, Judge. Remanded with directions; affirmed as modified.

Charles R. Khoury, under appointment by the Court of Appeal, for Defendant and Appellant, Francisco Jose Martinez.

Cynthia M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant, Daniel P. Romero.

Barbara A. Smith, under appointment by the Court of Appeal, for Defendant and Appellant, Marcellus Lopes Lee.

Kamala D. Harris, Attorney General, Kathleen Alice Kenealy, Chief Deputy and Acting Attorney General, Gerald A. Engler and Julie L. Garland, Assistant Attorneys General, Sharon Rhodes and Ryan H. Peeck, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Marcellus Lopes Lee, Daniel Paul Romero and Francisco Jose Martinez, Jr. (together, appellants or the defendants) guilty of fraud in the offer or sale of commodities. (Corp. Code, § 29536.)[1] Lee and Romero were also convicted of conspiracy and grand theft of personal property. (Pen. Code, §§ 182, subd. (a)(4), 487, subd. (a).) The jury found that the takings exceeded certain dollar amounts and that the victims' losses were in excess of $150,000. (Pen. Code, §§ 186.11, subds. (a)(2) & (a)(3), 12022.6, subd. (a)(2) (collectively, aggravated white collar criminal enhancements).) The trial court subsequently granted the defendants' motions for a new trial on some of the counts and dismissed other counts for insufficiency of the evidence. The People appealed. (*People v. Lee* (Mar. 7, 2014, No. D061235) [nonpub. opn.] (*Lee*).)

In *Lee*, we concluded that the trial court abused its discretion in reversing the jury's verdicts. We reversed the trial court's orders and remanded the case with

_____

[1] Unless otherwise specified, further statutory references are to the Corporations Code.

2

instructions to reinstate the verdicts rendered by the jury and sentence the defendants accordingly. In the interests of justice, we ordered the proceedings on remand to be heard before a trial judge other than the judge whose orders were reviewed on appeal.[2] (*Lee*, *supra*, No. D061235, Disposition.)

On remand, at the People's request, the sentencing court dismissed the counts on which the defendants were subject to retrial. The court sentenced Romero to a total of seven years in prison. Martinez received a one-year jail sentence and a five-year probation term. Lee was sentenced to a total of five years in prison.

In the instant appeal, Appellants assert there is not sufficient evidence to support their convictions for commodities fraud because they entered into money management contracts with their clients, not contracts for the sale or purchase of commodities. Martinez also argues there is not sufficient evidence to sustain his convictions even if money management contracts qualify as commodities contracts within the meaning of section 29536. Appellants claim the trial court prejudicially erred by failing to instruct the jury that scienter is an element of the offense of commodities fraud. They also contend reversal is required because the sentencing court refused to consider a motion for a new trial on grounds not decided by the trial court.[3]

---

[2]  We refer to the court to which we remanded the case as "the sentencing court."

[3]  In his petition for habeas corpus, Romero claims he receive ineffective assistance of counsel when his trial counsel did not join in Martinez's motion for a new trial.

Romero argues the trial court did not properly instruct the jury about the statute of limitations requirement for conspiracy. He contends the sentencing court erroneously ordered him to pay restitution to several alleged victims for crimes for which he was not convicted, and duplicating the amount of restitution owed to one of the victims. Romero and Martinez maintain there is insufficient evidence to support an aggravated white collar crime enhancement under Penal Code section 186.11, subdivision (a)(2), which requires a taking to be greater than $500,000. Finally, Romero contends the sentencing court erred by reinstating count six, which the court later dismissed at the People's request, and by reinstating his conviction on count seven, and sentencing him for that offense.[4]

The People concede the sentencing court erroneously reinstated counts six and seven, and we accept their concession. The People also concede the trial court erred when it did not instruct the jury that scienter is an element of the offense of commodities fraud, but contend the error was harmless. The People ask this court to review the possibility the sentencing court may not have imposed a mandatory fine under Penal Code section 186.11, subdivision (c).

We conclude that the restitution award to Ricky Lutz was incorrectly determined. We vacate Romero's conviction on count seven and remand for resentencing. Otherwise, we find no error and affirm.

---

[4] Romero filed a supplemental brief arguing the trial court erred in presenting embezzlement and larceny by trick as theories of a single theft offense not requiring unanimity. He withdraws this argument in view of *People v. Vidana* (2016) 1 Cal.5th 632, in which the California Supreme Court held that larceny and embezzlement are not separate offenses, but rather two ways of committing the single offense of theft. (*Id*. at pp. 648-649.)

4

FACTUAL AND PROCEDURAL BACKGROUND

We detailed the factual and procedural background of this case in our earlier decision, *Lee*, *supra*, No. D061235. We need not repeat those details here. Instead, we summarize the background of the case where relevant to the issues raised in these appeals.[5]

In early 2004, Romero and Martinez became interested in international currency trading. They had no background in trading or foreign currency. Romero and Martinez contacted Lee, a former stockbroker who had started trading in off-exchange foreign currency (forex). Lee's company was New England Capital Traders (NECT).

In August 2004, Romero opened an account with a futures commodity merchant (FCM). He acknowledged receiving a risk disclosure statement from the FCM, which stated stop-loss or stop-limit orders intended to limit losses to certain high returns and minimal risk through stop-loss discipline may not be effective because market conditions may make it impossible to execute such orders. Notwithstanding this advisement, Martinez developed a web site for his and Romero's company, Kingdom Advisors, which stated: "Investors may lower their exposure to risk by employing risk-reducing strategies such as 'stop-loss' or 'limit' orders."

Romero and Martinez solicited and received more than $600,000 in loans from two individuals to start trading. Using Lee as a trader, they had highly favorable returns for three to five months and were able to recruit other investors. After the initial period,

_____

[5] We deny Romero's motion for judicial notice, dated May 14, 2016, and the People's motion for judicial notice, dated July 6, 2016, as unnecessary.

Lee began to incur large trading losses. Despite the losses, Lee personally profited from every trade. Based solely on Lee's short-lived success, Lee, Romero and Martinez solicited several million dollars from other persons for the purpose of trading forex contracts. Lee and Romero told potential investors they had significant success trading foreign currency. They promised high rates of return and said they mitigated risk by implementing stop-loss procedures.

Unhappy that Lee was taking commissions, Romero and Martinez opened a trading account with another FCM, and received commissions or rebates on every trade regardless of performance. Romero and Martinez contracted with another trader, who was inexperienced and incurred large losses. Their clients lost most or all of their money. According to Romero's estimates, during a period of 16 to 18 months, Kingdom Advisors received from 10 to 30 percent of several million dollars in commissions from trading forex contracts.

In approximately late 2005, Romero and Martinez, together with Lee, decided to stop trading in the forex market and start an FCM, which they named TradeCo. They told existing clients the only way to recoup their losses was to invest in TradeCo. They solicited other persons to finance their new enterprise by promising high rates of return and the possibility of equity positions. After operating for two to three months, the NFA increased TradeCo's capitalization requirements and TradeCo ceased functioning.

On March 25, 2009, the People charged Lee, Romero and Martinez with conspiracy to defraud, commodities fraud and grand theft. The People alleged defendants falsely claimed substantial expertise and success trading foreign currency, promised

6

returns of 10 to 15 percent per month on investment funds and guaranteed investors they would not lose more than 20 percent of the initial value of their portfolio through the use of stop-loss mechanisms. The People also alleged as a result of their misrepresentations, defendants took more than 2.4 million dollars from individual victims, who lost most or all of their investments.

Trial began on February 28, 2011, and concluded on April 6, 2011. In the interests of brevity, we discuss only those counts for which the defendants were convicted and sentenced. Additional facts are set out in Discussion where relevant to the issues raised on appeal.

*Count One* (*Conspiracy*)

The People charged Lee, Martinez and Romero with conspiracy to defraud and alleged they committed 19 overt acts in furtherance of their conspiracy, including obtaining $100,000 from Robert Smith on or about November 3, 2004; $260,000 from Ricky Lutz between August to September 2005; $45,000 from Curtis Brown and $100,000 from Michael Mauch on or about November 28, 2005; $10,000 from Greg Hughes on or about March 30, 2006; $110,000 from Greg Sabal between May 10 and July 5, 2006; and $150,000 from Paul Cannon between September 25 and 28, 2006. The complaint alleged the defendants failed to return all but a small fraction of the money to their victims, despite demands by the victims for its return.

*Counts Eight and Nine* (*Robert Smith*)

The People charged the defendants with grand theft of personal property and fraud in the offer or sale of a commodity to Robert Smith. After several meetings with Romero

7

and Martinez, and with Lee, Romero and Martinez, Brian Smith, a financial advisor, advised his client, Robert Smith, to invest with the defendants. Brian Smith was aware that forex trading was high risk. Romero told Brian Smith they could provide a monthly return of six percent and had clients who were earning that rate. Brian Smith discussed foreign currency markets, liquidity leverage, technology and stop-loss as risk mitigation in technical terms with Lee. Brian Smith said the strategies Lee described for managing risk included stop-loss discipline and were "very reassuring."

In November 2004, Robert Smith invested $100,000 with Kingdom Advisors. He received a six percent return each month for three or four months. Kingdom Advisors did not provide any account or trade summaries. When Kingdom Advisors stopped sending checks, Brian Smith kept communicating with Romero, who assured him that Robert Smith's principal was intact and profits would resume. Robert Smith received one or two additional payments in the third quarter of 2005. Brian Smith never learned what happened to Robert Smith's principal.

Forensic accounting showed that Robert Smith's funds were commingled in a Kingdom Advisors trading account where Lee's company, NECT, had trading authority. The total initial balance was $478,385. Of that amount, there were trading losses of $149,630.50 and withdrawals of $328,754.50. The withdrawals included payments of $78,638 to Kingdom Advisors, $15,000 to Martinez, $11,000 to Martinez's organization, Luz de Vida, and transfers totaling $53,000 to Romero's personal bank account. In April 2005, Kingdom Advisors made a $5,000 payment to Robert Smith from another investor's account.

8

*Counts Ten and Eleven* (*Brian Smith et al.*)

The People charged the defendants with grand theft and commodities fraud from Brian Smith. At various times, six investors gave a total of $460,000 to Brian Smith, which he invested with the defendants through his company, Olympia Capital Management (Olympia). A few weeks later, the account suffered losses of approximately 70 percent. Brian Smith contacted Romero, who blamed the trading loss on a young trader. Brian Smith had met the trader but had not expected him to have any direct role in trading his accounts. When the trader suffered initial trading losses, he abandoned stop-loss discipline in hopes of recovering the funds, compounding the losses.

Brian Smith met with Romero and Martinez, who said Smith could recover his assets by investing in TradeCo. Martinez told Smith they could provide seven percent interest a month while maintaining safety on the principal. Smith invested the funds remaining in his trading account in TradeCo. He never learned what happened to those funds.

According to a forensic accountant, Jeremy Connelly deposited $10,000 in a Kingdom Advisors bank account in June 2005. That $10,000, along with other deposits, was withdrawn in various transactions that month. Kingdom Advisors received $4,300 of Connelly's money, of which $2,500 went to Romero's personal account. Between February and June 2006, Connelly received approximately $3,000 in payments from Olympia.

In November 2005, Michael Mauk deposited $100,000 with Olympia, which was wired to a trading account where Kingdom Advisors had trading authority. The trading

9

account had losses of $69,514 in two months, including commissions. From November 28, 2005 to January 26, 2006, Kingdom Advisors received approximately $63,500 in payments from the trading account. Romero personally received $9,500. Four thousand dollars was transferred to another one of Romero's business accounts.

Curtis Brown deposited $45,000 with Olympia in November 2005. A month later, Brown's funds were deposited in a trading account. There were transfers from the trading account to Olympia in February, May and June 2006 totaling $34,076.76. Those funds became part of Olympia's $75,000 deposit with Kingdom Advisors for TradeCo in July 2006. Of those funds, $69,000 was deposited in a TradeCo bank account. The remaining $6,000 was used to pay part of a settlement in a civil lawsuit that Romero owed to a third party.

Greg Hughes deposited $10,000 with Olympia in March 2006. Those funds, together with Greg Sabal's $100,000 deposit, were distributed as follows: In May, $30,000 was placed in a trading account; $35,000 was transferred to a Kingdom Advisors bank account; and the remaining funds were part of Olympia's $75,000 transfer to Kingdom Advisors for TradeCo. Romero used the funds that were transferred to Kingdom Advisors for his personal expenses, included a $24,500 payment to Hoehn Motors, and other payments to Disney Resort, Romero's credit cards, airlines, hotels and restaurants, and to replenish another client's trust account.

In September 2006, Cannon deposited a total of $152,600 with Olympia. His funds comprised a large portion of a $140,000 transfer to Kingdom Advisors. Of that

transfer, a $10,000 check made out to Daniel Romero's wife was deposited in Romero's personal account. Cannon's money was never deposited in any trading account.

*Counts Twelve and Thirteen* (*Lutz*)

Romero and Lee were charged with grand theft and fraud in the offer or sale of commodities to Ricky Lutz. In early 2005, Lutz contacted Romero for information about forex. Romero sent him a brochure stating Kingdom Advisors had returns of 10 to 14 percent a month. The brochure stated "the investment manager has established a stop-loss policy with authorized traders such that they are to cease trading should any account suffer a 20 percent loss below the series' most recent highest asset valuation."

Lutz spoke to Lee on numerous occasions about stop-loss. Lee told him if the investment funds dropped below 80 percent of their original amount, trading would stop and the investor would be notified. Lee showed Lutz returns showing that investors had doubled their money in eight months. Lutz knew that a forex investor could make a lot of money and could lose a lot of money. That was why he was "such a stickler" about the stop-loss provision. Lutz believed that a loss of 20 percent of his investment was the worst case scenario.

Relying "100 percent" on Lee and Romero's representations, Lutz recruited four other investors. Together, they deposited $260,000 in Lee's trading company in August and September 2005. In early September, Lee sent Lutz an e-mail stating the investment was up 67 percent. Approximately three weeks later, Lutz learned that one of his accounts had lost more than 50 percent of its initial value and another account was down approximately 40 percent. Lutz told Lee he was in violation of their agreement and

11

demanded that Lee restore the accounts to 80 percent of their original value.  Lee said the lack of notice to Lutz at the 20 percent mark was an oversight.  He had some safer, small trades that would bring the account balances back to their original amounts.  Lutz authorized Lee to continue trading.

On October 12, 2005, Lutz told Lee to close his accounts and return the balance of $105,000 to him.  On November 6, Lee notified Lutz he had closed the trading account and was ending his forex trading career.  Lee said Lutz's account was down approximately 90 percent but he had a solution that would help them both succeed.  He asked Lutz to invest his investors' remaining funds, and additional funds, in TradeCo.  Lee promised Lutz he would return the expected profits on his original investment to him.  After declining Lee's offer, Lutz received a payment of $24,162, which he returned to one of his investors.

*The Defense Case*

Martinez testified he was not responsible for the way trades were conducted.  He said he did not have access to trading accounts or records, or authority over the disbursement of funds from Kingdom Advisors.  Martinez said he did not misrepresent Kingdom Advisors' success to any prospective clients or guarantee that a client would not lose his or her investment.  Martinez testified he confronted Romero about his use of Kingdom Advisors funds.  Romero had built a pool at his home, and purchased a Porsche and a BMW, all-terrain vehicles, a trailer and jewelry.  Martinez acknowledged he was vice president of Kingdom Advisors, a partner in TradeCo, but said he did not have an ownership interest in the company.  Martinez acknowledged he had signatory authority

12

for Kingdom Advisors' bank accounts and signed documents as the vice president of Kingdom Advisors, and he had trading authority over its accounts.

Romero testified when he spoke to potential clients, he simply relayed his experience in the market during the early months of trading. He promised "best efforts" but never guaranteed a specific rate of return. Romero was not responsible for Kingdom Advisors' Web site, which stated that stop-loss discipline would be used to limit losses. Martinez developed the Web site with content from an FCM.

Lee did not testify on his own behalf.

*Jury Verdicts*

The jury convicted Romero of conspiracy (count one), commodities fraud (counts seven, nine, eleven and thirteen) and grand theft (counts eight, ten and twelve). The jury found Martinez guilty of commodities fraud (counts nine and eleven). As to Lee, the jury returned guilty verdicts on the counts of conspiracy, commodities fraud (counts nine, eleven and thirteen) and grand theft (count twelve). As to all of the defendants, the jury made true findings on three white collar penalty enhancements under Penal Code sections 186.11 and 12022.6.[6]

*Post-Trial Proceedings*

The defendants filed new trial motions under section 1181, subdivision (6) on the ground there was insufficient evidence to support the verdicts. The trial court granted

---

[6] The jury acquitted Martinez and Lee of counts six and seven. The jury did not reach a verdict on the following counts: Lee—counts two, three, four, five, eight and ten; Romero—counts two, four and six; and Martinez—counts one, eight and ten.

new trials on counts nine, eleven and thirteen, and dismissed counts two, three, four, five, eight, nine, twelve and thirteen. The trial court also dismissed count one as to Martinez, and count ten as to Martinez and Lee. (*Lee*, *supra*, No. D061235, at pp. 16-17.)

The People appealed. Our court determined the trial court erred in granting the motions for new trial on grounds of instructional error. In addition, the trial court applied an incorrect legal standard in dismissing the defendants' convictions for legal insufficiency of the evidence. (*Lee*, *supra*, No. D061235, at p. 3.) We reversed the trial court's orders and remanded the matter to the superior court with instructions to reinstate the jury verdicts and sentence the defendants accordingly. The People had the discretion to seek a retrial on the counts that ended in mistrial. (*Lee*, at p. 60.)

*Remand*

After the matter was remanded to the sentencing court, Martinez filed an opposed motion for new trial on his convictions for commodities fraud. He argued the trial court did not rule on his new trial motion and he was entitled to a decision on the merits. The sentencing court denied the motion for a new trial, stating it had an obligation to follow the order on remand to reinstate the verdicts and sentence the defendants.

At the sentencing hearings,[7] the court sentenced Martinez to one year in the county jail and five years of probation for his convictions on two counts of commodities fraud. The court did not impose a sentence on the white collar criminal enhancements.

---

[7]    Lee's trial counsel was ill on the date set for the sentencing hearing, which was continued to January 8, 2015.

Martinez was ordered to pay various fines and fees, and provide restitution to his victims in an amount to be determined.

The sentencing court denied Romero's request for probation and sentenced him to a total of seven years in prison, as follows: two years on count seven, which the court designated as the principal count; two years, stayed, for conspiracy; count nine, one year, consecutive; count ten, two years, stayed; count eleven, one year, consecutive; count twelve, two years, stayed; and count thirteen, one year, consecutive. In addition, the sentencing court imposed a two-year consecutive sentence on aggravated white collar criminal enhancements. In addition to fines and fees, the court ordered Romero to pay restitution in the amount of $81,500 to McClelland, $110,000 to Capell, $395,282 to Lutz, $40,000 to Shemtov, and an amount to be determined to Brian Smith.

As to Lee, the sentencing court imposed a total of five years' imprisonment. The court set the principal term of three years on count nine, and sentenced him to three years each on counts eleven and thirteen, to run concurrently. The court imposed, and stayed, a one-year sentence for conspiracy and two years for grand theft (count twelve). Lee received an additional two-year term on the white collar criminal enhancement. Lee was ordered to pay fines, fees, and restitution in an amount to be determined to Brian Smith and John Shea Buenas,[8] and restitution in the amount of $81,500 to McClelland; $110,000 to Capell; $395,282 to Lutz; and $40,000 to Shemtov.

DISCUSSION

---

[8] The name John Shea Buenas does not appear in any of the charging documents or in Lee's probation report.

15

# I

## COMMODITIES FRAUD

### A

### *The Parties' Arguments*

The People charged Romero, Lee and Martinez with violations of section 29536, subdivision (b) (the statute), which states, "It is unlawful for any person, directly or indirectly, in connection with the purchase or sale of, the offer to sell, the offer to purchase, the offer to enter into, or the entry into, a commodity, commodity contract, or commodity option to . . . willfully make any false report, enter any false record, make any untrue statement of a material fact, or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

Appellants contend there is not sufficient evidence to support their convictions on charges of commodities fraud. They state section 29536 is limited to misrepresentations connected to actual contracts to purchase commodities, and does not include misrepresentations that may have been made in non-commodities contracts between investors and money managers. Appellants contend the relationship between the defendants and the investors did not involve currency trading because their clients opened money management accounts, and did not enter into commodities contracts.

Romero argues merely informing potential clients they could trade in commodities contacts was not an offer to buy or sell commodities, and any alleged misrepresentations

underlying the commodity fraud charges were therefore not made in connection with the purchase or sale of a commodity.

Martinez claims the contracts that were discussed in his presence were money management contracts, not commodities contracts. He argues a discretionary trading account is not an investment governed by section 29536. Martinez further argues there is insufficient evidence to support his convictions on commodities fraud. He asserts he was a clerk and office manager, and had nothing to do with the sale or offer of commodities.

Lee asserts that as a trader, he never acted as a buyer or seller of commodities or commodities options. He argues the contracts he signed with retail customers were several steps removed from being contracts for commodities sales or purchases. Lee joins in Romero's and Martinez's argument.

The People contend Appellants' interpretation of section 29536 is overly narrow. They argue section 29536 prohibits the use of fraud and other specified conduct by any person in connection with the offer or sale of foreign currency, regardless of how the parties characterize and structure their agreement. The People assert there is substantial evidence to support Martinez's convictions for commodities fraud.

B

*The Legislature Did Not Intend to Limit the Meaning of "Commodity" and "Commodity Contract" to Any Particular Type of Account, Agreement or Contract*

The parties' arguments raise an issue of statutory interpretation we must address before considering the sufficiency of the evidence in this case. (*Burden v. Snowden*

17

(1992) 2 Cal.4th 556.)  Statutory interpretation is de novo.  (*Ibid*.)  "The rules governing statutory construction are well settled.  We begin with the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent.  [Citations.]  'In determining intent, we look first to the language of the statute, giving effect to its "plain meaning." '  [Citations.]  Although we may properly rely on extrinsic aids, we should first turn to the words of the statute to determine the intent of the Legislature."  (*Id*. at p. 562.)

In arguing their conduct did not come with section 29536, Appellants rely on *CFTC v. White Pine Trust Corporation* (2009 9th Cir.) 574 F.3d 1219 (*White Pine Trust*), which held that discretionary trading accounts are not contracts to purchase commodities under the federal Commodity Exchange Act, 7 U.S.C. section 1 et seq.  Appellants' reliance on *White Pine Trust* is misplaced.

In enacting the California Commodities Law of 1990, the Legislature intended to fill a regulatory void with respect to the offer and sale of commodities and commodity contracts due to the lack of jurisdiction over case transactions in commodities and commodity contracts by the Commodities Futures Trading Commission (CFTC) under federal law, including the Commodity Exchange Act (the Act) and California law governing securities (section 25000 et seq.).  (Stats.1990, ch. 969, § 1 (A.B.4253).)  Thus, a case interpreting the Act has little, if any, relevance to questions of statutory interpretation under the California Commodities Law of 1990, which governs acts over which the CFTC does not have jurisdiction.

Further, even if it were relevant, *White Pine Trust*, *supra*, 574 F.3d 1219 does not assist Appellants here. Instead, it illustrates the differences between the narrow definitions in the Act and the expansive statutory language in the California Commodities Law of 1990. The issue in *White Pine Trust* is whether the CFTC has jurisdiction to bring a civil proceeding against a person who fraudulently solicited investments for trading in the spot and options markets for foreign currency, but whose employer commingled investor funds with general funds and then stole the money for himself. (*Id.* at p. 1221.) In construing relevant provisions of the Commodities Exchange Act (the Act), the reviewing court noted that title 7 United States Code section 2(c)(1)(A) exempts agreements, contracts and transactions in certain financial instruments, including foreign currency. However, title 7 United States Code section 2(c)(2)(B)(i)(I)-(II) restores coverage over a specific subset of foreign currency transactions. (*White Pine Trust*, at p. 1223.) The reviewing court held that the CFTC can bring an action only if it can show " 'an agreement, contract or transaction in foreign currency . . . that is . . . an option[ ] *and* is offered to, or entered into with, [a retail investor].' " (*Ibid.*)

Unlike 7 United States Code section 2(c)(1)(A), which governs civil proceedings, the California statutory scheme governing a criminal action for commodities fraud under Corporations Code section 29536 contains no such exemptions for "agreements, contracts and transactions in certain financial instruments." The California legislature defines

"commodity contract"[9] as "*any account, agreement, or contract* for the purchase or sale, primarily for speculation or investment purposes and not for use or consumption by the offeree or purchaser, of one or more commodities, whether for immediate or subsequent delivery or whether delivery is intended by the parties, and *whether characterized as a cash contract, deferred shipment or deferred delivery contract, forward contract, futures contract, installment or margin contract, leverage contract, or otherwise*."  (Corp. Code, § 29505, italics added.)  By definition, the term "commodity" includes any foreign currency.  (Corp. Code, § 29504.)

We conclude that the Legislature did not intend to limit the meaning of "commodity" and "commodity contract" to any particular type of account, agreement or contract.  Section 29505 states the parties' characterization of the type of account, agreement or contract is not determinative.  The use of the word "otherwise" in section 29505 indicates the language is to be interpreted broadly.  We conclude that section 29536 encompasses any investment account, agreement or contract that is used for the purchase or sale of commodities.  Thus, the parties' characterization of the type of vehicle that is used "for the purchase or sale, primarily for speculation or investment purposes

_____

[9]     "A 'commodity contract' includes a commodity option as defined in Section 29510, unless otherwise specified."  (§ 29505.) " 'Commodity option' means any account, agreement, or contract giving a party thereto the right but not the obligation to purchase or sell one or more commodities or one or more commodity contracts, or both, whether characterized as an option, privilege, indemnity, bid, offer, put, call, advance guaranty, decline guaranty, or otherwise, but shall not include an option traded on a national securities exchange registered with the United States Securities and Exchange Commission."  (§ 29510.)

and not for use or consumption by the offeree or purchaser, of one or more commodities," is not determinative. (§ 29505.)

Appellants argue the accounts they set up for their clients were not for the purchase or sale of commodities. We disagree. The record shows Romero, Martinez and Lee offered forex trading to prospective clients. Kingdom Advisors' website offered forex trading. Romero and Lee discussed their methods to mitigate risk in forex trading, informed prospective clients of their successes in forex trading, and did not disclose the losses their clients had suffered in forex trading. Each victim who testified said they believed they were investing money with the defendants to trade on the forex market. Brian Smith testified his client Robert Smith wrote a check for $100,000 and Brian Smith sent it to Romero "for investment in the Forex markets." Two of the victims had access to online accounts where they could monitor forex trading on their behalf.

We are not persuaded by Lee's argument his convictions for commodity fraud must be reversed because, as a trader, he never acted as a buyer or seller of commodities or commodities options. Similarly, we reject Romero's contention he merely informed potential clients they could possibly trade in commodities contracts. Section 29536 does not require that a person personally buy or sell commodities or commodities options to be held responsible for fraud. Its language is plain. Instead, a person is criminally liable for commodities fraud if he or she "*directly or indirectly, in connection with* the purchase or sale of, the offer to sell, the offer to purchase, the offer to enter into, or the entry into, a commodity, commodity contract, or commodity option to" willfully makes any false

21

report, any untrue statement of a material fact, or omits to state a material fact that is necessary to make the statements made not misleading. (§ 29536, italics added.)

The record shows that Romero and Lee solicited investments after experiencing heavy losses, lied to investors about the nature of the risk of forex trading, and assured investors their principal was intact, when in fact it had been lost in trading or used to maintain the appearance of profitability or transferred to the defendants' personal accounts. In so doing, they made false reports and untrue statements of material fact, and omitted to state material facts that were necessary to make their representations not misleading, in connection with offers to conduct transactions in foreign currency.

C

*There Is Substantial Evidence to Support Martinez's Convictions for Commodities Fraud*

Martinez contends there is not sufficient evidence to support his convictions for commodities fraud notwithstanding the argument the client accounts did not come within the meaning of section 29536. The record belies Martinez's argument he was only a clerk and office manager, and had nothing to do with the sale and offer of commodities. He argues Brian Smith acknowledged testifying at his preliminary hearing Martinez never said anything of substance and Smith was not aware of any representations or misrepresentations by Martinez.

"When a jury's finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, on the entire record, there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact, and when two or

22

more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the jury. It is of no consequence that the jury, believing other evidence or drawing other inferences, might have come to a contrary conclusion." (*People v. Mendonsa* (1982) 137 Cal.App.3d 888, 891, citing *People v. Johnson* (1980) 26 Cal.3d 557, 576-577.)

The record contains substantial evidence to support the jury's conclusion that Martinez was guilty of commodities fraud on counts nine (Robert Smith) and eleven (Brian Smith). Martinez developed Kingdom Advisor's website, which falsely claimed the defendants' forex trading program was able to mitigate risk through stop-loss mechanisms. In late 2004, after several other investors had lost substantial sums of their investments in defendant's forex trading program, Romero and Martinez met with Brian Smith to discuss forex trading. Martinez told Brian Smith their venture was profitable and could provide a return of approximately seven percent per month "with a lot of safety on principal." Brian Smith testified in meetings in which he and Romero discussed forex trading and their methods of mitigating risk, Martinez would "echo" and "amplify" Romero's remarks. Thus, there is substantial evidence in the record to show Martinez willfully made an untrue statement of a material fact in violation of section 29536.

Martinez argues there is insufficient evidence to show that Brian Smith relied on any of his statements in deciding to invest with the defendants. Brian Smith testified when he heard Romero and Martinez said their clients were earning six percent per month, and Smith and his client could earn that amount, he questioned their statements. Brian Smith said Romero and Martinez did not characterize the rate of return as a

23

guarantee, and if they had, he would not have believed them. Brian Smith testified he knew the venture was "high risk, very fast, very, very liquid." He explained he was "seeking some safety and something to mitigate the risk that I knew was there. And their descriptions for how they manage that aspect of the program were very reassuring." The record shows that Brian Smith knew that forex trading was high risk but relied on the defendants' representations they could mitigate that risk. The jury could reasonably conclude that Brian Smith relied on Martinez's statements "echoing" and "amplifying" representations by Romero and Lee concerning risk management before recommending the venture to Robert Smith and other investors. Thus there is substantial evidence to show Brian Smith relied on Martinez's statements in deciding to invest in defendants' trading scheme.

In addition, forensic accounting shows that Martinez omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. (§ 29536.) Robert Smith's funds were commingled in a Kingdom Advisors trading account. The total initial balance in that account was $478,385. Of that amount, there were trading losses of $149,630.50 and withdrawals of $328,754.50. The withdrawals included payments of $15,000 to Martinez and $11,000 to Martinez's organization, Luz de Vida. There is no record of Martinez disclosing his intent to divert a portion of Robert Smith's investment to his own accounts, instead of using it for forex trading. Thus, the record shows that Martinez failed to state material facts relating to Robert Smith's investments in the defendants' forex trading

24

scheme. We conclude that there is substantial evidence to support Martinez's convictions for commodity fraud under section 29536.

Because we sustain Martinez's convictions for commodity fraud, we need not consider his argument the reversal of his convictions for commodities fraud necessarily requires reversal of the aggravated white collar criminal enhancement.

II

INSTRUCTIONAL ERROR

A

*Scienter*

1. *The Parties' Arguments*

In *People v. Simon* (1995) 9 Cal.4th 493 (*Simon*), a case addressing the elements of securities fraud under section 25401, the California Supreme Court held that "knowledge of the falsity or misleading nature of a statement or of the materiality of an omission, or criminal negligence in failing to investigate and discover them, are elements of the criminal offense described in section 25401."[10] (*Id.* at p. 522.) Relying on *Simon*, Appellants argue the trial court had a sua sponte duty to instruct the jurors that to find the defendants guilty of commodities fraud, they must find that the defendants knew or

_____

[10] "It is unlawful for any person to offer or sell a security in this state, or to buy or offer to buy a security in this state, by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading." (§ 25401.)

should have known that their statements were false at the time the statements were uttered. Appellants contend the trial court's failure to do so was prejudicial error.

The People agree scienter is an element of commodities fraud. They argue the error is harmless beyond a reasonable doubt because there is overwhelming evidence to show the defendants had guilty knowledge of the falsity of their statements and the prosecutor's argument clearly stated jurors were required to consider the defendants' guilty knowledge in deciding whether to convict them on charges of commodities fraud.

2.     *Legal Principles and Standard of Review*

"We review de novo whether a jury instruction correctly states the law. [Citation.] Our charge is to determine whether the trial court ' "fully and fairly instructed on the applicable law." [Citation.]' [Citation.] We look to the instructions as a whole and the entire record of trial, including the arguments of counsel. [Citation.] Where reasonably possible, we interpret the instructions ' "to support the judgment rather than [to] defeat it." ' " (*People v. Mason* (2013) 218 Cal.App.4th 818, 825.)

An "instructional error that improperly describes or omits an element of an offense, or that raises an improper presumption or directs a finding or a partial verdict upon a particular verdict" is subject to review under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). (*People v. Flood* (1998) 18 Cal.4th 470, 502-503 (*Flood*).) Under *Chapman*, the harmless error analysis "is 'whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." ' " (*Flood*, *supra*, at p. 494.)

3.     *Additional Factual Background*

26

The trial court reviewed each proposed jury instruction with counsel. The agreed upon instructions for commodities fraud tracked the statutory language for each relevant statute, including the definition of commodity (§ 29504), the definition of commodity contract (§ 29505), the definition of offer (§29513), and the definitions of sale and sell (§ 29516). As to the substantive offense of fraud in the offer or sale of commodities (§ 29536), the trial court instructed the jury, without objection:

> "To prove that a defendant is guilty of this crime, the People must prove that:
> 1. The defendant, directly or indirectly, in connection with the purchase or sale of, the offer to sell, the offer to purchase, the offer to enter into, or the entry into a commodity, commodity contract, or commodity option; and
> 2. willfully [did make] any false report, entered any false record, made any untrue statement of a material fact, or omitted to . . . state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."

During closing argument, the prosecutor told the jury: "Commodities fraud. It's lying to someone with the hope they will rely [on your statements], you get the money." The prosecutor pointed out Romero made false statements when he applied for a trading account to facilitate forex trading. Romero represented he made $250,000 a year, had a million dollars in total assets, including $800,000 in liquid assets. None of those statements were true. The prosecutor said Romero deceitfully omitted other relevant facts from other documents, including his resume. For example, Romero failed to disclose he did not have any experience in the financial sector or forex trading. The prosecutor argued, "If they're willing to lie to open up these trading accounts, to facilitate their business ventures, their fraud, their theft, you think for a minute they wouldn't be

27

willing to lie to their potential customers, to their clients? The prosecutor characterized the defendants as "con men" and their conduct as "lying to get other people's money."

Romero's trial counsel concluded his closing argument by stating, "I ask you [the jury] to find Mr. Romero not guilty on all counts based on a complete lack of evidence that he or anyone else lied to any of the investors. Referring to the fact the defendants received money for each trade whether it made or lost money, Martinez's trial counsel said, "So as long as there's no lie at the beginning, it doesn't really matter if they were getting paid at both ends."

4.    *Analysis*

The defendants were charged with violating section 29536, subdivision (b), which makes it unlawful to "willfully make any false report, enter any false record, make any untrue statement of fact, or omit to state a material fact necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading" in connection with, directly or indirectly, "the purchase or sale of, the offer to sell, the offer to purchase, the offer to enter into, or the entry into, a commodity, commodity contract, or commodity option." We agree with the parties that a violation of section 29536 requires "scienter," which is guilty knowledge of the false or misleading nature of a representation, or omission to disclose, at the time the representation or omission occurs. (*Simon*, *supra*, 9 Cal.4th at p. 507.)

Section 29536 requires the misrepresentation is made willfully. "Where 'willfulness' is made a vital ingredient of a crime, it implies 'knowledge and purpose to do wrong.' " (*People v. Armentrout* (1931) 118 Cal.App.Supp. 761, 773.) "Consistent with

28

that requirement, and in appropriate cases, knowledge has been held to be a concomitant of willfulness." (*People v. Honig* (1996) 48 Cal.App.4th 289, 334 (*Honig*) [willfully implies the person knows was he is doing]; see *People v. Loeper* (1959) 167 Cal.App.2d 29, 33 [to do a thing willfully *is to do it knowingly*].)

"[T]he term 'willfully' has been interpreted in a number of statutory contexts as requiring more than mere volition in committing the prohibited act." (*Stark v. Superior Court* (2011) 52 Cal.4th 368, 401.) For example, in a case addressing the term "willfully participates" under section 25550, which prohibits certain acts in the purchase or sale of securities, the reviewing court stated "the purpose and intent of the willful participation requirement is to clarify and underscore the high level of scienter required for a violation of section 25500. The most reasonable interpretation of the phrase 'willfully participates' is to limit section 25500 liability to situations where there is an intent to defraud through a knowingly false statement. Only persons who willfully, not merely recklessly, violate section 25400, subdivision (d)[11] can be liable for damages." (*California Amplifier, Inc. v. RLI Ins. Co*. (2001) 94 Cal.App.4th 102, 112.)

In *Simon*, *supra*, 9 Cal.4th 493, the California Supreme Court considered the mental state necessary to establish a violation of section 25401. Section 25401

---

11     In language similar to section 29536, section 25400, subdivision (d) states that if "a broker-dealer or other person selling or offering for sale or purchasing or offering to purchase the security, to make, for the purpose of inducing the purchase or sale of such security by others, any statement which was, at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, or which omitted to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and which he knew or had reasonable ground to believe was so false or misleading."

"generally provides that it is unlawful to offer or sell a security by means of a communication which includes an untrue statement of material fact or which omits a material fact about the security. The criminal penalty for violation of that section is found in section 25540 of that code. Under its terms, any person who 'willfully violates' . . . section 25401 is guilty of a felony. This penal provision does not explicitly contain a requirement that the accused have knowledge of the falsity of the statement." (*Honig*, *supra*, 48 Cal.App.4th at p. 335.) The *Simon* court held that "knowledge of the falsity or misleading nature of a statement or of the materiality of an omission, or criminal negligence in failing to investigate and discover them, are elements of the criminal offense described in section 25401." (*Simon*, 9 Cal.4th at p. 522; *People v. Salas* (2006) 37 Cal.4th 967, 979-981.) The *Simon* court recognized " 'a "prevailing trend 'away from the imposition of criminal sanctions in the absence of culpability where the governing statute, by implication or otherwise, expresses no legislative intent or policy to be served by imposing strict liability.' " ' " (*Honig*, at pp. 334-335.)

We agree with the parties' contention section 29536 requires a showing of scienter. Section 29536 requires the defendant to "willfully make" any misrepresentation concerning the purchase or sale of a commodity. We hold that "knowledge of the falsity or misleading nature of a statement or of the materiality of an omission" (*Simon*, *supra*, 9 Cal.4th at p. 522) is an element of the criminal offense described in section 29536. The trial court has a sua sponte duty to instruct the jury on all of the elements of a charged offense. (*People v. Cummings* (1993) 4 Cal.4th 1233, 1311.) The failure to do so here was error.

30

5.      *The Instructional Error is Harmless Beyond a Reasonable Doubt*

After reviewing the record, we conclude the failure to instruct the jury about knowledge of the falsity of the statement is harmless beyond a reasonable doubt. (*Chapman*, *supra*, 386 U.S. at p. 24.)  The trial court instructed the jury that to find the defendants guilty of commodities fraud, it must find that the defendants *willfully* made a false report, false record, an untrue statement of a material fact, or omitted to correct a misleading statement.  Willfully means that the action was deliberate and implies knowledge.  (*Honig*, *supra*, 48 Cal.App.4th at p. 334; *People v. Loeper*, *supra*, 167 Cal.App.2d at p. 33.)  The prosecution repeatedly told the jury to convict the defendants of commodities fraud, it had to find they had lied to their clients.  In this context, the common meaning of "to lie" is "to make an untrue statement with intent to deceive." (Merriam-Webster's Coll. Dict. (11th ed. 2006) at p. 717, col. 2.)  Trial counsel for Romero and Martinez also told the jury that lying was the key to their clients' guilt or innocence.

The record shows beyond a reasonable doubt that Romero, Martinez and Lee knowingly made false reports, and omitted to correct misleading statements, to their victims.  The timeline of the victim's losses clearly supports this conclusion.  Kara Mucha, a CFTC investigator, testified that with one small exception,[12] all of the defendants' trading accounts had net losses.  The defendants started their forex trading scheme in early 2004 by recruiting two investors.  They had 30 percent returns a month

_____

12      One account showed a $2,859 return on a $100,000 investment.

31

for three to four months before losing most, if not all, of the investors' funds. In June or July 2004, David Shemtov and his business partner, Djamshid Younessi, (counts two, three, four and five) gave Lee and Romero $50,000 each. Within days, their investments lost more than half their value. In September 2004, after meeting with Romero, Martinez and Lee, William McClelland and his business partner (counts six and seven) invested $100,000 with defendants. The defendants represented they would receive returns of eight to 15 percent, and only 20 percent of their investment would be at risk. McClelland testified they would not have made the investment had the risk been greater than 20 percent. They received several payments of $10,000 but never received any statements. In early 2005, they liquidated their account and received the balance of $18,500.

Martinez testified he knew at the time the two initial investors lost money. He telephoned them and told them their money was lost. Martinez said it was "just the two of them" at that point. One of the investors sued Romero and Martinez. Martinez testified he understood the risk and volatility of forex trading, and believed there was some risk involved. By July 2004, Romero knew that the two initial investors, and Shemtov and Younessi, had suffered significant losses. The record supports the reasonable inference that Lee, who was responsible for executing the forex trades, was aware of the victims' losses as they occurred. Thus, by summer 2004, the defendants knew that forex trading had not been successful and their clients had lost significant sums of money.

The record shows that Romero, Martinez and Lee met with Brian Smith (counts nine and eleven) in late 2004. They told him their forex trading venture was profitable,

32

which was not true, and they had clients who were earning seven per cent a month, which also was not true. None of the defendants disclosed that after initial gains, their clients had lost significant amounts in investing in their forex trading scheme. The defendants also represented they could manage risk through stop-loss mechanisms without disclosing that those mechanisms had not prevented their other clients from losing most, if not all, of the money they gave to the defendants for forex trading.

Romero and Lee met with Ricky Lutz (count 13) in the spring of 2005. Romero represented that they had returns of 10 to 14 percent a month. Lee showed Lutz returns showing that investors had doubled their money in eight months. Lutz discounted Romero's and Lee's representations about the rate of return, but relied "100 percent" on their representations about their ability to mitigate risk through stop-loss mechanisms. Based on what Romero and Lee told him, Lutz believed that a loss of 20 percent of his investment was the worst case scenario. He would not have invested with Romero and Lee if the risk were greater than 20 percent. When he first set up his venture, Romero acknowledged receiving a risk disclosure statement from an FCM, which stated stop-loss or stop-limit orders intended to limit losses to certain high returns and minimal risk through stop-loss discipline may not be effective because market conditions may make it impossible to execute such orders. (*Lee*, *supra*, No. D061235, at p. 5.) Romero and Lee did not inform Lutz that almost all their clients had lost significant amounts of money in forex trading and that stop-loss mechanisms had not been, and may not be, effective in limiting losses to 20 percent.

33

The record clearly shows that the defendants knowingly made material misrepresentations, and omitted "to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." (§ 29536, subd. (b).) These statements were made in connection with "the purchase or sale of, the offer to sell, the offer to purchase, the offer to enter into, or the entry into, a commodity, commodity contract, or commodity option." (*Ibid.*) We conclude beyond a reasonable doubt the instructional error did not affect the jury's verdict. (*Flood*, *supra*, 18 Cal.4th at p. 504.)

B

*Unanimity Instruction on Statute of Limitations on Conspiracy Count*

"[C]onspiracy is a separate and distinct crime from the offense that is the object of the conspiracy and is governed by a separate and distinct statute of limitations." (*People v. Milstein* (2012) 211 Cal.App.4th 1158, 1168.) Romero contends the trial court erred by not instructing the jurors they must unanimously agree at least one overt act in furtherance of the conspiracy occurred within the statute of limitations. He asserts the prosecution was required to prove that at least one overt act occurred within three years of his arraignment date, on or before March 27, 2009. Romero states that of the 19 overt acts alleged in the conspiracy count, only three occurred within the statute of limitations (overt acts 16, 17 and 19). Romero contends the funds at issue in those three overt acts were not intended for commodities trading, but were investments in TradeCo, and the jury could find that those three overt acts were not part of the conspiracy to defraud another of property.

34

The People assert Romero has forfeited his argument on appeal for failing to raise the necessity of an unanimity instruction with respect to the timing of overt acts within the statute of limitations for conspiracy. Alternatively, if the issue is not forfeited, they contend Romero was not entitled to an unanimity instruction on the conspiracy count. The People argue if Romero were entitled to an unanimity instruction, error, if any, is harmless because the jury returned a unanimous verdict in count ten (corresponding to overt acts 14, 15, 16, 17 and 18), alleging grand theft from multiple victims. Thus, the record shows more than merely an "implied finding that at least one of the acts took place as charged." (*People v. Zamora* (1976) 18 Cal.3d 538, 550 (*Zamora*), overruled in part on other grounds in *Cowan v. Superior Court* (1996) 14 Cal.4th 367.)

1. *Additional Factual Background*

The amended complaint alleged the defendants committed 19 overt acts in furtherance of their conspiracy to defraud. Of these, overt acts 1 and 19 alleged the defendants engaged in a conspiracy between April 1, 2004 and September 28, 2006, to defraud others through an elaborate bogus investment scheme involving trading in the foreign currency exchange market, and took approximately $1,067,000 from the individual victims named in the other overt acts. The People alleged three of those overt acts were committed after March 27, 2006 (overt acts 16, 17 and 18).

The trial court instructed the jurors on the four-year statute of limitations for grand theft and commodities fraud. The trial court also instructed the jury on the elements of conspiracy. Defense counsel did not object to the instructions or request an instruction

requiring the jury to find that at least one overt act in furtherance of the conspiracy must have occurred within the three-year statute of limitations.

2.      *Forfeiture*

The People contend Romero did not request an unanimity instruction at trial and has forfeited the issue on appeal. Romero contends the issue is not forfeited because the trial court was required sua sponte to give an unanimity instruction on the conspiracy count. Romero further contends that even if the court was not required to give an unanimity instruction, the error is not forfeited because there is a reasonable probability he would have obtained a better outcome absent the error. Further, Romero asserts to the extent the issue is forfeited, he received ineffective assistance of counsel.

In *People v. Williams* (1999) 21 Cal.4th 335 (*Williams*), the California Supreme Court considered whether a defendant could raise the statute of limitations for the first time on appeal. (*Id*. at p. 339.) The Court held "when the charging document indicates on its face that the action is time-barred, a person convicted of a charged offense may raise the statute of limitations at any time." (*Id*. at p. 341.) When the charging document does not indicate on its face the action is time barred, the forfeiture rule applies. (*People v. Thomas* (2007) 146 Cal.App.4th 1278, 1289 (*Thomas*), disapproved on other grounds by *People v. Shockley* (2013) 58 Cal.4th 400, 405.)

"It has long been the rule in conspiracy cases that a limitation period begins to run from the time of the last overt act committed in furtherance of the conspiracy." (*Zamora*, *supra*, 18 Cal.3d at p. 548.) Romero acknowledges three of the 19 overt acts alleged in the conspiracy count occurred within the statute of limitations. The charging document

36

does not indicate on its face the action is time-barred. (*Williams*, *supra*, 21 Cal.4th at p. 341.) Thus, the special rule on nonforfeiture does not apply. (*Thomas*, *supra*, 146 Cal.App.4th at p. 1289.)

Even were the issue not forfeited, we would not be persuaded the trial court has a sua sponte obligation to give an unanimity instruction on the statute of limitations in a conspiracy. As a general rule, the trial court need only instruct on the statute of limitations when placed at issue by the defense as a factual matter in the trial. (*People v. Smith* (2002) 98 Cal.App.4th 1182, 1192-1193 (*Smith*).) In asserting this general principle does not apply here, Romero relies on a footnote in *People v. Russo* (2001) 25 Cal.4th 1124 (*Russo*). In *Russo*, the California Supreme Court held that a conviction for conspiracy requires proof that at least one of the conspirators committed an overt act in furtherance of the conspiracy but the jury need not unanimously agree on a specific overt act as long as it unanimously finds beyond a reasonable doubt that some conspirator committed an overt act in furtherance of the conspiracy. (*Id*. at p. 1128.) In a footnote, *Russo* states there may be some cases in which "the trial court may have to give some form of unanimity instruction. For example, if there is a question regarding the statute of limitations, the court might have to require the jury to agree an overt act was committed within the limitations period [citation], or if evidence existed that the defendant had withdrawn from the conspiracy, the court might have to require the jury to agree an overt act was committed before the withdrawal." (*Id.* at p. 1136, fn. 2) The Court declined to address the issue further, stating "[n]o such circumstance exists here, so we do not consider these questions." (*Ibid*.)

Thus, *Russo* suggests only that a court may have to give some form of unanimity instruction *if there is a question* regarding the statute of limitations. (*Russo*, 25 Cal.4th at p. 1136, fn. 2.) This language is consistent with the general rule the trial court need only instruct on the statute of limitations when placed at issue by the defense. (*Smith*, *supra*, 98 Cal.App.4th at pp. 1192-1193.) It does not suggest the trial court has a sua sponte duty to instruct the jury on unanimity in the absence of any question about the statute of limitations. Thus, we are not persuaded *Russo* constitutes authority to fashion an exception to the general rule of forfeiture on the statute of limitations. (*Smith*, pp. 1192-1193.)

3. *Ineffective Assistance of Counsel*

Romero contends he received ineffective assistance of counsel because his trial counsel did not raise the potentially meritorious defense that no overt act was committed within the state of limitations for conspiracy. He argues the jury did not find Lee guilty of count ten, which corresponds to overt acts 26, 27 and 28, and this suggests the jury could not agree beyond a reasonable doubt the actions described in those acts were in furtherance of the conspiracy. He argues those overt acts involved funding for TradeCo, which defendants started and operated until the CFTC changed its regulations, and the jury could find overt acts 26, 27 and 28 were not part of a criminal conspiracy.

" 'An ineffective assistance claim has two components: A [defendant] must show that counsel's performance was deficient, and that the deficiency prejudiced the defense.' [Citations.] [¶] . . . [¶] 'To establish deficient performance, a petitioner must demonstrate that counsel's representation "fell below an objective standard of

38

reasonableness." ' "  (*In re Welch* (2015) 61 Cal.4th 489, 514.)  To establish prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 694.)  A defendant he must show "a probability sufficient to undermine confidence in the outcome."  (*Ibid*.)

Assuming, without deciding, trial counsel's performance was deficient for not requesting an unanimity instruction on the statute of limitations in the conspiracy count, Romero cannot show there is "a probability sufficient to undermine confidence in the outcome."  (*Strickland v. Washington, supra*, 466 U.S. at p. 694.)  Romero's conviction on count ten for grand theft of personal property from Brian Smith, an agent for Curtis Brown, Paul Cannon (overt act 28), Greg Hughes (overt act 26), Michael Mauch, Greg Sabal (overt act 27), and Robert Smith, eliminate a reasonable probability the statute of limitations barred the conspiracy count.  We reject the argument the jury could find there were no overt acts committed within the statute of limitations because the clients' funds that were solicited for TradeCo were not overt acts committed in furtherance of the conspiracy.  The uncontroverted evidence shows that Romero obtained funds from Hughes, Sabal and Cannon after March 27, 2006, and diverted some of those funds to his personal accounts.  The fact the jury did not return a verdict on count 10 in Lee's case is not relevant.  (See *Russo, supra*, 25 Cal.4th at p. 1128 [conviction for conspiracy requires proof that at least one of the conspirators committed an overt act in furtherance of the conspiracy].)  In addition, the evidence shows the defendants started TradeCo to avoid paying fees to other FCMs, thereby increasing their own takings, and any solicitation of

funds for TradeCo were in furtherance of their conspiracy to defraud. Romero does not meet his burden to show prejudicial error.

## III

### *Motion for New Trial*

1. *The Parties' Arguments*

Martinez complains the sentencing court erred in refusing to hear his motion for new trial on his convictions for commodities fraud. Citing *People v. Braxton* (2004) 34 Cal.4th 798, 818-819 (*Braxton*), Martinez contends this court has the authority under section 1260 to remand the matter to the trial court to decide the new trial motion and the failure to do so "would be tantamount to a federal due process violation under the Fourteenth Amendment." (Some capitalization omitted.) He acknowledges the sentencing court is not in a position to rule on a motion for new trial as a 13th juror, and asks the matter be remanded to the trial court.

Romero contends the trial court, as the 13th juror, would have granted a new trial had it not dismissed the charges on erroneous grounds. He argues the trial court did not rule on the matter as a 13th juror and asks this court to remand the matter to the trial court to rule on the new trial motion. Romero contends he did not forfeit the issue by failing to join in Martinez's motion on remand. He asserts to the extent the issue is forfeited, he received ineffective assistance of counsel.[13]

---

[13] Romero raises this issue in his Petition for Writ of Habeas Corpus.

Lee argues had the trial court not erroneously effected acquittals on various charges and instead considered the lesser remedy of a retrial, the trial court may have granted the new trial motion as a 13th juror. He further states to the extent his trial counsel did not join in Martinez's motion for new trial, he received ineffective assistance of counsel.

The People assert the sentencing court correctly denied the motion for new trial in view of the limited remand issued by this court in *Lee*. Relying on *Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341, the People argue Appellants are collaterally estopped from relitigating issues argued and decided in prior proceedings.

2.      *Applicable Legal Principles*

"The court may reverse, affirm, or modify a judgment or order appealed from, or reduce the degree of the offense or attempted offense or the punishment imposed, and may set aside, affirm, or modify any or all of the proceedings subsequent to, or dependent upon, such judgment or order, and may, if proper, order a new trial and may, if proper, remand the cause to the trial court for such further proceedings as may be just under the circumstances." (Pen. Code, § 1260.) "If a judgment against the defendant is reversed, such reversal shall be deemed an order for a new trial, unless the appellate court shall otherwise direct." (Pen. Code, § 1262.)

" 'The effect of an unqualified reversal ("the judgment is reversed") is to vacate the judgment, and to leave the case "at large" for further proceedings as if it had never been tried, and as if no judgment had ever been rendered. [Citations.]' [Citations.] [¶] Generally an unqualified reversal has the effect of remanding the case for a new trial on

41

all the issues presented by the pleadings [citation] and the parties have the right to file amended pleadings before a retrial." (*In re Anna S.* (2010) 180 Cal.App.4th 1489, 1499-1500.)

"After the remittitur 'the appellate court has no further jurisdiction of the appeal or of the proceedings thereon, *and all orders necessary to carry the judgment into effect shall be made by the court to which the certificate is remitted.*' (Pen. Code, § 1265, italics added.) Thus, the trial court is revested with jurisdiction of the case, *but only to carry out the judgment as ordered by the appellate court.*" (*People v. Dutra* (2006) 145 Cal.App.4th 1359, 1365-1366 (*Dutra*).) "[T]he terms of the remittitur define the trial court's jurisdiction to act." (*Snukal v. Flightways Manufacturing, Inc.* (2000) 23 Cal.4th 754, 774, fn. 5 (*Snukal*).) The trial court is bound to follow the remittitur whether it believes the appellate court's decision is right or wrong, or has been impaired by subsequent decisions. (*Dutra*, at p. 1367.)

Here, the People appealed the trial court's orders dismissing some counts and granting new trials on other counts. This court reversed those orders and remanded the matter to "the superior court with instructions to reinstate the verdicts rendered by the jury and sentence the defendants accordingly. The defendants may be retried on the deadlocked counts." (*Lee*, *supra*, No D061235, at p. 60.) Thus, in view of this court's remittitur, the sentencing court did not err in denying to hear the motion for new trial. (*Snukal*, *supra*, 23 Cal.4th at p. 774, fn. 5; *Dutra*, *supra*, 145 Cal.App.4th at p. 1367.)

IV

SENTENCING

42

A

*Restitution*

1.    *The Parties' Contentions*

Romero challenges the restitution awards to David Shemtov, Wayne McClelland,

Ricky Lutz and William Capell.  Romero claims the court has the authority to impose

restitution only for losses caused by the operative crimes for which he was convicted.

Citing *People v. Lai* (2006) 138 Cal.App.4th 1227, 1246-1248 (*Lai*) and *People v. Woods*

(2008) 161 Cal.App.4th 1045, 1052, Romero argues he was not convicted on counts

alleging grand theft and commodity fraud from Shemtov and McClelland, and conspiracy

is not the operative crime that resulted in the victims' loss.  Romero points out the minute

order ($895,282.28) differs from the oral pronouncement ($395,282.28) of restitution to

Lutz.  He also contends the sentencing court improperly calculated the amount of

restitution awarded to Lutz and Capell, and the full award to Lutz is not supported by

substantial evidence.[14]

---

[14]    Romero contends the sentencing court was not authorized to include compound
interest in Lutz's restitution order.  This issue is raised in the body of his brief and was
not presented under a separate argument heading as required by California Rules of
Court, rule 8.204(a)(1)(B).  The People do not respond to this argument.  In the interest of
fairness, we do not address this issue here.

The requirement that issues be presented under a separate argument heading,
showing the nature of the question to be presented and the point to be made, are part of
the " '[o]bvious considerations of fairness' " to allow the respondent its opportunity to
answer these arguments.  (*People v. Roscoe* (2008) 169 Cal.App.4th 829, 840, quoting
*Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8.)  Rule
8.204(a)(1)(B) also " 'lighten[s] the labors of the appellate [courts] by requiring the
litigants to present their cause systematically and so arranged that those upon whom the
duty devolves of ascertaining the rule of law to apply may be advised, as they read, of the

The People contend the sentencing court properly awarded restitution to Shemtov and McClelland based upon Romero's conviction for conspiracy. Asserting that tort principles of causation apply to victim restitution claims in criminal cases, they argue in the absence of a conspiracy to defraud victims, Shemtov and McClelland likely would not have suffered any losses. Thus, the sentencing court could rationally determine the defendants' conspiracy directly led to the victims' economic losses.

2. *Statement of Law and Standard of Review*

As a matter of right under the California Constitution, "all persons who suffer losses as a result of criminal activity shall have the right to seek and secure restitution from the persons convicted of the crimes causing the losses they suffer." (Cal. Const., art. I, § 28, subd. (b).) Penal Code section 1202.4, subdivision (f) states "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order []." "A victim's restitution right is to be broadly and liberally construed." (*Mearns*, *supra*, 97 Cal.App.4th at p. 500; *People v. Phu* (2009) 179 Cal.App.4th 280, 283.)

Penal Code section 1202.4, subdivision (a)(1), declares "the intent of the Legislature that a victim of crime who incurs an economic loss as a result of the commission of a crime shall receive restitution directly from a defendant convicted of

exact question under consideration, instead of being compelled to extricate it from the mass.' " (*People v. Roscoe*, at p. 840, quoting *Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830-1831, fn. 4.)

44

that crime." Restitution "shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct" (§ 1202.4, subd. (f)(3)), and must include, but is not limited to, such costs as "the value of stolen or damaged property." (Pen. Code, § 1202.4, subd. (f)(3)(A).) (*People v. Jessee* (2013) 222 Cal.App.4th 501, 507.)

When a defendant is sentenced to state prison, Penal Code section 1202.4 limits restitution to "losses caused by the criminal conduct for which the defendant was convicted." (*Lai*, 138 Cal.App.4th at p. 1249; *Woods*, *supra*, 161 Cal.App.4th at pp. 1049, 1052 (*Woods*) [scope of victim restitution is limited to those arising out of the operative crime that formed the basis of the conviction].) Thus, "[i]n every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court." (Pen. Code, § 1202.4, subd. (f).) " 'The statute . . . requires the award be set in an amount which will fully reimburse the victim for his or her losses unless there are clear and compelling reasons not to do so . . . .' " (*Mearns*, *supra*, 97 Cal.App.4th at p. 499.) "While it is not required to make an order in keeping with the exact amount of loss, the trial court must use a rational method that could reasonably be said to make the victim whole, and it may not make an order which is arbitrary or capricious." (*Id.* at p. 498.)

We review the trial court's restitution order for abuse of discretion. A restitution order that is based on a demonstrable error of law constitutes an abuse of the trial court's

discretion.  (*Woods*, *supra*, 161 Cal.App.4th at pp. 1048-1049.)  " 'When there is a factual and rational basis for the amount of restitution ordered by the trial court, no abuse of discretion will be found by the reviewing court.' "  (*Mearns*, *supra,* 97 Cal.App.4th at p. 499.)

3.     *Forfeiture*

We first address the People's claim Romero has forfeited his claim by failing to assert it in the trial court.  An unauthorized sentence " 'constitutes a narrow exception to the general requirement that only those claims properly raised and preserved by the parties are reviewable on appeal.' "  (*People v. Anderson* (2010) 50 Cal.4th 19, 26 (*Anderson*), quoting *People v. Scott* (1994) 9 Cal.4th 331, 354.)  Generally, an unauthorized sentence is one that " 'could not lawfully be imposed under any circumstance in the particular case.' "  (*Ibid.*)  "An obvious legal error at sentencing that is 'correctable without referring to factual findings in the record or remanding for further findings' is not subject to forfeiture."  (*In re Sheena K.* (2007) 40 Cal.4th 875, 887.)

Romero argues the sentencing court exceeded its authority by duplicating Capell's restitution award in the restitution awarded to Lutz; ordering restitution to Shemtov and McClelland when he was not convicted of the operative crimes underlying those restitution orders; and incorrectly calculating the amount of Lutz's restitution award by not subtracting the full amount of money that was returned to him and by including losses incurred after Lutz authorized the defendants to continue trading on his account.

The claims the sentencing court ordered a duplicate restitution award and restitution for crimes for which the defendant was not convicted fall within "the 'narrow

46

exception' for 'a so-called unauthorized sentence or a sentence entered in excess of jurisdiction.' " (*Anderson*, *supra*, 50 Cal.4th 19, 26, quoting *In re Sheena K.*, *supra*, 40 Cal.4th at pp. 886-887.) However, Romero's claims Lutz incorrectly calculated the amount of restitution due him by subtracting only $20,000 instead of $24,162, the amount of principal that was actually returned to him, and by including losses incurred after Lutz authorized continued trading on his account, are purely factual issues that are susceptible to waiver. (*People v. Zito* (1992) 8 Cal.App.4th 736, 742.) Because Romero did not raise these factual issues at sentencing, he has forfeited them on appeal. (*Ibid.*)

4.    *Analysis*

a.    *Lutz and Capell*

Romero was convicted of grand theft and commodities fraud from Lutz. The record shows that in August and September 2005, Lutz recruited William Capell, Cy Houston, Jason Herter and Susan Baier. Together, they deposited $260,000 in Lee's trading company. Capell invested $110,000. After incurring large losses, Lutz told Lee to close his accounts and return the balance of his principal, which was then $105,000, to him. Several weeks later, Lutz received a payment of $24,162, which he returned to Baier.

At sentencing, Lutz claimed restitution in the amount of $240,000 plus five percent interest, compounded, from April 2005 through April 2015 years, totaling $395,282.28. The sentencing court ordered victim restitution in the amount of $395,282.26. This amount was recorded in the minute order as $895,282.26, resulting in

47

an error in the total restitution award in the abstract of judgment. The People concede this amount was erroneously recorded.

On his own behalf, Capell claimed restitution in the amount of $110,000. The sentencing court ordered Romero to pay $110,000 to Capell.

The People concede the awards to Lutz and Capell are duplicative, and ask this court to remand to the sentencing court to determine whether to modify Lutz's or Capell's restitution order. However, the California Supreme Court has held that "[Penal Code] section 1202.4 and the Victims' Bill of Rights allow each defined victim to seek and obtain restitution only for that person's or entity's own personally incurred loss. (*People v. Runyan* (2012) 54 Cal.4th 849, 860.) In view of this principle, we conclude that Capell's restitution order should not be modified, and instead remand the matter to the sentencing court with directions to modify Lutz's restitution award.

b.      *Shemtov and McClelland*

The People charged Romero and Lee with grand theft (count two) and commodities fraud (count three) against David Shemtov. In count one, overt act 3, the People alleged that Romero and/or Lee, in furtherance of their conspiracy to defraud, obtained a $50,000 investment from Shemtov. Within a week to 10 days of Shemtov's investment, his account had lost more than 50 percent of its value. Shemtov closed his account and withdrew the remaining funds ($19,463.49). Romero sent an additional $2,000 to Shemtov to reimburse him for his losses. The jury did not reach verdicts on the Shemtov counts, indicating it could not agree whether the crimes were committed within

48

the statute of limitations.  On remand, Romero and Lee were subject to retrial on those counts; however, the sentencing court dismissed the charges at the People's request. Shemtov requested, and the sentencing court ordered, restitution in the amount of $40,000.

In count one, overt act 5, the People alleged that Romero, in furtherance of the defendants' conspiracy, obtained a $100,000 investment from William McClelland and Bill Lahr.  The jury found Romero and Lee guilty of conspiracy.  The People also alleged Romero, Lee and Martinez had committed grand theft (count six) and commodities fraud (count seven) against McClelland and Lahr.  The jury returned a guilty verdict against Romero on count seven and did not reach a verdict on count six.  After hearing a motion for a new trial, the trial court dismissed counts six and seven.  The People did not appeal the order dismissing those counts.  On remand, as we have discussed, the sentencing court erroneously reinstated Romero's conviction on count seven.

McClelland filed a restitution statement showing he invested $100,000 with Kingdom Advisors in September 2004.  He received $10,000 a month in earnings in November and December 2004, and February 2005.  In March 2005, he received $18,500, his remaining principal.  McClelland requested, and the sentencing court ordered, restitution in the amount of $81,500.

Romero contends he was not convicted of the operative crimes underlying the restitution orders for Shemtov and McClelland.  He argues the restitution orders constitute an unauthorized sentence under Penal Code section 1202.4, which limits restitution to "losses caused by the criminal conduct for which the defendant was

49

convicted."  (*Lai*, *supra*, 138 Cal.App.4th at p. 1249; *Woods*, *supra*, 161 Cal.App.4th at pp. 1049, 1052.)  Raising an issue of first impression, Romero argues his conviction for criminal conspiracy is not sufficient to support a restitution award to Shemtov or McClelland because it is not the operative crime that resulted in the victims' losses.

The People argue the sentencing court acted within its discretion.  They contend " 'tort principles of causation apply to victim restitution claims in criminal cases.' " (*People v. Holmberg* (2011) 195 Cal.App.4th 1310, 1321.)  The People argue in the absence of a conspiracy to defraud, Shemtov and McClelland likely would not have suffered any losses because the underlying crimes would not have occurred.  The People acknowledge the jury rendered an inconsistent verdict by not convicting Romero of the underlying offenses of theft or commodities fraud, but argue the trial court could rationally determine that the defendants' conspiracy led to the victims' economic losses.

Relying on *Woods*, *supra*, 161 Cal.App.4th at p. 1052, Romero argues conspiracy is not the "operative crime" that led to the victims' losses.  *Woods* does not define the phrase "operative crime."  The term "operative" means "[b]eing in or having force or effect."  (Black's Law Dict. (10th ed. 2014.) p. 1265, col. 1.)  Penal Code section 1202.4, subdivision (f) authorizes restitution "in every case in which a victim has suffered economic loss as a result of the defendant's conduct."  Case law limits "the defendant's conduct" to "criminal conduct for which the defendant was convicted."  (*Lai*, *supra*, 138 Cal.App.4th at p. 1249.)  We conclude that the phrase "operative crime" is equivalent to the phrase "criminal conduct for which the defendant was convicted."

50

On this record, we conclude that the sentencing court did not abuse its discretion by ordering Romero to pay restitution to Shemtov and McClellan. Romero was convicted of conspiracy to defraud others. He was specifically charged with committing overt acts to obtain funds from Shemtov and McClelland in furtherance of the conspiracy. The jury did not acquit Romero of the charges of grand theft and commodities fraud against Shemtov and McClelland. (See *People v. Foalima* (2015) 239 Cal.App.4th 1376, 1396 [in nonprobation cases, restitution order is not authorized where the defendant's only relationship to the victim's loss is by way of a crime for which defendant was acquitted].) Instead, in Shemtov's case, the jury indicated it could not reach consensus on whether the offenses were committed within the statute of limitations. In McClelland's case, the jury convicted Romero of grand theft and commodities fraud. Although the People did not challenge the trial court's dismissal of those counts on appeal, the jury's findings of guilt allows the reasonable inference it determined that Romero had in fact obtained a $100,000 investment from McClelland in furtherance of the conspiracy to defraud him of his property. Similarly, the record supports the finding that Romero secured $50,000 from Shemtov in furtherance of his conspiracy to defraud others. In both cases, this was criminal conduct that led to the victims' economic loss. (Pen. Code, § 1202.4, subd. (f).)

The California Constitution states "all persons who suffer losses as a result of criminal activity shall have the right to seek and secure restitution from the persons convicted of the crimes causing the losses they suffer." (Cal. Const., art. I, § 28, subd. (b).) Thus, in view of the constitutional and statutory presumptions in favor of victim's

51

rights, we conclude that the sentencing court did not abuse its discretion in ordering Romero to pay restitution to the victims of Romero's and Lee's criminal conspiracy.

B

*White Collar Crime Enhancement*

1.     *The Parties' Contentions*

Romero contends the jury's true finding on the aggravated white collar crime enhancement is not supported by substantial evidence and must be reversed.  Romero argues he was convicted on three counts of grand theft and the prosecution proved only the victims' losses totaled $258,100.  Martinez joins in Romero's arguments.

The People contend the aggravated white collar crime enhancement is triggered by either a taking or a loss of property, and the jury properly found that the defendants took more than $500,000 from the victims.

2.     *Applicable Statutory Principles and Standard of Review*

"The purpose of the aggravated white collar crime enhancement [is] to provide a mechanism for greater punishment for criminals who engage in a pattern of fraudulent activity that results in a large amount of accumulated takings."  (*People v. Williams* (2004) 118 Cal.App.4th 735, 747; Pen. Code, § 186.11, subd. (a).)  If the pattern of related felony conduct involves *the taking of*, or results in the loss by another person or entity of, more than five hundred thousand dollars ($500,000), the additional term of punishment shall be two, three, or five years in the state prison."  (Pen. Code, § 186.11, subd. (a)(2), italics added.)

52

The relevant amount of a "taking" is the aggregate value of all property of which the defendant acquired possession through the offenses of which he is convicted, even if the victim subsequently recovered some or all of it, or received offsetting compensation or benefits by some other means. (Cf. *People v. Frederick* (2006) 142 Cal.App.4th 400, 421 (*Frederick*) [interpreting Penal Code section 12022.6, which provides for an enhanced penalty for taking, damaging or destroying property in the commission of a felony].) " '[T]he Legislature did not intend that the application of [Penal Code] section 12022.6 should depend upon the fortuitous circumstances of whether the police were able to recover stolen property or the victim was able to establish a civil claim for the return of property or its proceeds . . . .' " (*Frederick*, at p. 421, quoting *People v. Ramirez* (1980) 109 Cal.App.3d 529, 539.)

We apply the substantial evidence standard in reviewing a finding of an aggravated white collar crime enhancement. (*People v. Mozes* (2011) 192 Cal.App.4th 1124, 1131)

3.      *Analysis*

Romero and Martinez were convicted of defrauding Robert Smith. Subtracting the amount of money that was paid to Robert Smith, they contend his losses were only $84,000. We disagree. The record shows that Robert Smith, acting in reliance on the defendants' fraudulent misrepresentations, invested $100,000 with Kingdom Advisors. The defendants acquired possession of $100,000 from Robert Smith through the offenses of which they are convicted. Thus, this amount is the "taking" within the meaning of

53

Penal Code section 186.11, subdivision (a).  (Cf. *Frederick*, *supra*, 142 Cal.App.4th at p. 421.)

Romero and Martinez were convicted of defrauding Brian Smith.  We reject the argument that the "taking" from Brian Smith was his loss of $258,100.  The defendants received $460,000 from Brian Smith, who was persuaded by the defendants' materially false statements and omissions to invest his client's money.  Thus, this amount is the "taking" within the meaning of Penal Code section 186.11, subdivision (a).  (Cf. *Frederick*, *supra*, 142 Cal.App.4th at p. 421.)

Romero was convicted of defrauding Lutz, who invested a total of $260,000 with the defendants.  Relying on *People v. Williams* (2013) 218 Cal.App.4th 1038, 1069 (*Williams*), which holds that a "taking" under Penal Code section 12022.6 excludes a victim's economic losses (such as lost interest and attorney fees), Romero argues because Lutz knowingly placed 20 percent of his investment at risk and authorized Romero to continue trading after suffering large losses, the "taking" was in the amount of $26,811.25.

Romero's reliance on *Williams* is legally and factually misplaced.  The *Williams* court holds that the references to "loss" in Penal Code section 12022.6, subdivisions (a)(2) and (b) mean the value of the property taken, damaged or destroyed, and does not include other types of economic losses, such as lost income or profits, suffered by the victim.  (*Williams*, *supra*, 218 Cal.App.4th at p. 1069; *People v. Evans* (2013) 215 Cal.App.4th 242, 253.)  Thus, for example, victims cannot recover the amount of earnings they may have lost as a result of the crime.  *Williams* does not stand for the

54

proposition that because a victim was advised of the possibility of a 20 percent loss, the amount of the taking or loss is diminished only by that amount. Essentially, Romero argues because he and Lee misrepresented their risk mitigation strategy and Lutz relied on their misrepresentation, they are not liable for the entire amount of Lutz's loss.

Penal Code section 186.11, subdivision (a)(2) provides the enhanced penalty for aggravated white collar crime applies if the pattern of related felony conduct involves the *taking*, or results in the loss by another person, of more than $500,000. (Pen. Code, § 186.11, subd. (a)(2) (italics added).) The record shows Lutz relied "100 percent" on Lee and Romero's representations about their rate of return and stop-loss protections in deciding to invest with them. Lutz, with four other investors, deposited $260,000 in Lee's trading company. This constitutes a taking within the meaning of Penal Code section 186.11. The amount of the taking is not mitigated by any misrepresentation that Lutz' potential losses were limited to 20 percent of his investment, or because he authorized continued trading in an attempt to recover his losses.

The evidence shows that the jury could reasonably conclude the defendants took at least $820,000 from their victims. We conclude there is substantial evidence to support the jury's true finding on the aggravated while collar crime enhancement.

C

*Fine*

The People contend the sentencing court "appears" to not have imposed a mandatory fine on Martinez and Romero under Penal Code section 186.11, subdivision (c). The People acknowledge the court imposed fines of $800 on Martinez and $1400 on

55

Romero, but point out the court did not indicate the statute under which the fines were imposed.

The People do not affirmatively show error. (*Corenevsky v. Superior Court* (1984) 36 Cal.3d 307, 321.) "The general rule is that a trial court is presumed to have been aware of and followed the applicable law." (*People v. Mosley* (1997) 53 Cal.App.4th 489, 496-497.) "A judgment or order of the lower court is *presumed correct.* All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown." (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) "These general rules concerning the presumption of regularity of judicial exercises of discretion apply to sentencing issues." (*Mosley*, *supra*.) In the absence of a clear claim of error, we presume the trial court correctly followed the law.

## DISPOSITION

The matter is remanded to the superior court with instructions to vacate Romero's conviction on count seven, and resentence him accordingly. The court shall also recalculate the restitution award to Lutz. In all other respects, the judgments are affirmed.

O'ROURKE, J.

WE CONCUR:

McCONNELL, P. J.

NARES, J.

**CERTIFIED FOR PUBLICATION**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>FRANCISCO JOSE MARTINEZ et al.,<br><br>    Defendants and Appellants. | D067052<br><br><br><br>(Super. Ct. No. SCD219673) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MARCELLUS LOPES LEE,<br><br>    Defendant and Appellant. | D067561<br><br>(Super. Ct. No. SCD219673)<br><br>ORDER<br>MODIFYING OPINION,<br>DENYING REHEARING,<br>AND CERTIFYING OPINION<br>FOR PUBLICATION<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on March 9, 2017, be modified as follows:

1. The following sentence is added to the end of the first paragraph of footnote 14 on page 44:

However, on remand for resentencing to recalculate Romero's restitution award to Lutz, Romero may raise, and the trial court may decide, the issue of whether the court is authorized to include compound interest in the award, bearing in mind that the court may not award postjudgment interest in excess of ten percent simple

interest per year.  (Pen. Code, § 1202.4, subd. (f)(3)(G); *Westbrook v. Fairchild* (1992) 7 Cal.App.4th 889, 893.)

The second paragraph of footnote 14 on page 44 is deleted.

2.  In the first sentence of the first full paragraph on page 48, the word "years" is deleted so that the sentence now reads as follows:

> At sentencing, Lutz claimed restitution in the amount of $240,000 plus five percent interest, compounded, from April 2005 through April 2015, totaling $395,282.28.

3.  In the last sentence of the first full paragraph on page 56, the word "while" is replaced with the word "white" so that the sentence now reads as follows:

> We conclude there is substantial evidence to support the jury's true finding on the aggravated white collar crime enhancement.

4.      At the end of the last sentence of the first full paragraph on page 56, footnote 15 is added as follows:

> In his supplemental reply brief filed with this court's permission, Romero argues the trial court erred by not sua sponte instructing the jury on the legal meanings of "taking" and "loss" for purposes of Penal Code section 186.11, subdivision (a), citing *People v. Hudson* (2006) 38 Cal.4th 1002, 1012 for the principle that a trial court has a sua sponte duty to define an element of an offense beyond the statutory language when that language has a technical sense that differs from its nonlegal meaning.  He contends that the general meaning of the words "taking" and "loss" includes all money received from the victim (taking) or all money never returned to the victims (loss), whereas the legal meaning of those words in the context of Penal Code section 186.11 is restricted to a *wrongful* taking or the amount of loss caused by wrongful conduct.

> We conclude the court had no sua sponte duty to instruct the jury on the meanings of "taking" and "loss" in Penal Code section 186.11, and that Romero forfeited this claim of instructional error by not requesting such an instruction below.  "A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal." (*People v. Lee* (2011) 51 Cal.4th 620, 638; *People v. Hudson, supra,* 38 Cal.4th at p.1012 [" '[A] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' "].)

The court instructed the jury with CALCRIM No. 3221 that it had to decide whether the People had proved "the additional allegation that the defendant engaged in a pattern of *related felony conduct that involved the taking of or resulted in the loss* by another person or entity of more than $500,000." (Italics added.) By tying the "taking" or "loss" to "felony conduct," this instruction adequately informed the jury that the taking under consideration was *wrongful* and the amount of loss involved was caused by *wrongful* conduct. An additional instruction merely explaining to the jury that "taking" and "loss" for purposes of the white collar crime enhancement under Penal Code section 186.11 means a *wrongful* taking or the amount of loss caused by *wrongful* conduct would have constituted an instruction that merely amplified CALCRIM No. 3221. Therefore, the trial court had no sua sponte duty to give such an instruction, and Romero forfeited his claim on appeal that the court erred in failing to give it.

There is no change in the judgment.

Appellant Romero's petition for rehearing is denied.

Appellant Martinez's petition for rehearing is denied.

The opinion in this case filed March 9, 2017, was not certified for publication.

It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and ORDERED that the words "Not to Be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

McCONNELL, P. J.

Copies to: All parties

3