Filed 12/18/20  P. v. Taylor CA4/1
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>CORYELL C. TAYLOR,<br><br>     Defendant and Appellant. | D076498<br><br><br>(Super. Ct. No. SCN379246) |

APPEAL from a judgment of the Superior Court of San Diego County, Harry M. Elias, Judge.  Affirmed.

Aaron J. Schechter, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Robin Urbanski and Mary Katherine Strickland, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Coryell Taylor stabbed three teenagers—one fatally—who were drinking alcohol, smoking marijuana, and listening to music late one night under a dark highway overpass. Taylor argued at trial that the teens were the initial aggressors and that he acted in self-defense. Because the evidence at trial suggested Taylor had smoked methamphetamine the day of the incident, the trial court instructed the jury with CALCRIM No. 625, which (1) explains that the jury may consider evidence "of the defendant's voluntary intoxication only" in determining whether he possessed the requisite mental state to commit murder; (2) defines voluntary intoxication; and (3) reiterates that the jury "may not consider evidence of voluntary intoxication for any other purpose." The jury ultimately found Taylor guilty of murder (Pen. Code, § 187, subd. (a)),[1] with a deadly weapon enhancement (§ 12022, subd. (b)(1)); attempted premeditated murder (§§ 187, subd. (a), 189, 664), with a deadly weapon enhancement (§ 12022, subd. (b)(1)); and assault with a deadly weapon (§ 245, subd. (a)(1)). The trial court sentenced him to an indeterminate term of 64 years to life, and a determinate term of eight years.

On appeal, Taylor contends the third aspect of CALCRIM No. 625 misinstructed the jury that it could not consider evidence of *the teens'* voluntary intoxication, which he maintains undermined his self-defense claim. Based on our review of the entire record—including the challenged instruction (both in isolation and in context of the overall jury charge), the extensive evidence of the teens' intoxication introduced at trial by both sides, and counsels' extensive comments during closing arguments about the teens' intoxication—we conclude Taylor's appellate challenge is without merit.

Accordingly, we affirm.

---

[1] Further undesignated statutory references are to the Penal Code.

# I.  FACTUAL AND PROCEDURAL BACKGROUND

## A.  The Incident

On the night of October 20, 2017, three teenagers—Alan S. (17), Adrian A. (18), and Jesus H. (17)—were drinking alcohol, smoking marijuana, and listening to music on an elevated platform under a dark highway overpass near the Oceanside harbor.  The teens hung out there for a few hours.

Meanwhile, Taylor, who lived in a homeless encampment in a riverbed near the overpass, was searching for his missing toiletries bag.  Cesar Robles, a fellow transient, helped Taylor search.

Taylor and Robles's search led them under the overpass, along a path downhill from the platform where the teens were hanging out.  Taylor shined his flashlight in the teens' faces, and Alan asked him to redirect the light.[2] Taylor made a comment to the teens that they construed as indicating he was affiliated with a gang.  None of the teens were in a gang, so Alan responded, "we don't bang, . . . we aren't from any gangs."  Taylor told the teens to come down off the platform, implying he wanted to fight them.  The teens responded that they were just drinking and were not looking for any trouble.  Alan told Taylor and Robles to "[k]eep it steppin' " or "[k]eep it moving," so they left.

After they had been walking for a while, Taylor told Robles, "I'm not going to let them get away," and started running back toward the underpass.  Robles followed Taylor to "back him up."  Taylor and Robles returned to the overpass via a different path that led directly to the elevated platform where

---

[2]    There was conflicting trial testimony about the precise chronology, wording, and tone of the exchanges between Alan and Taylor during this encounter.

the teens were located.  About five or 10 minutes had passed since Taylor and Robles first left the overpass.

Taylor and Robles approached the teens on the platform, and Taylor yelled, "What's up now?"  Taylor pointed a knife at the teens and told them to get on their knees.  Alan said "no," grabbed a vodka bottle he had been drinking from, and held it as a weapon.  Adrian pulled out a knife he was carrying.  Alan and Taylor lunged at each other; Robles ran at Jesus and tried to tackle him; and Adrian slipped on loose dirt and fell to the ground, dropping his knife and losing his eyeglasses.

As Taylor and Alan skirmished, Taylor stabbed Alan in the neck, chest, and through the eye socket and into his brain.  Alan fell to the ground.

During Alan's skirmish with Taylor, Adrian had grabbed Taylor's legs to try to stop him.  Adrian felt a sensation like someone was kicking him, but he later realized he was being stabbed.  Taylor had stabbed Adrian twice in the back and twice in the arm.  When Adrian saw Alan on the ground, he let go of Taylor.

Taylor then turned and slashed Jesus's face with the knife.  Jesus stopped struggling with Robles, and Taylor and Robles fled.

As Robles and Taylor were walking away, Robles saw Taylor wipe blood off his knife.  Taylor told Robles, "I stabbed all three of them . . . ."  Taylor and Robles returned to the homeless encampment, put their bloody clothing in bags, and threw the bags into a river that leads to the ocean.  Two homeless people witnessed some of this conduct.

Adrian called 911, and police and medical personnel responded.  Alan was transported by helicopter to the hospital, where he died about 24 hours later.  Adrian and Jesus were treated at the hospital and released.

Police later arrested Robles, who admitted he was present during the attack, and identified Taylor as the perpetrator who stabbed the teens. Police later arrested Taylor, whose cellphone records placed him in the area of the attack around the time it happened.

## B. Charges, Verdicts, and Sentence

Taylor was charged with one count of murder (§ 187, subd. (a)), with a deadly weapon enhancement allegation (§ 12022, subd. (b)(1)) as to Alan; one count of attempted premeditated murder (§§ 187, subd. (a), 189, 664), with a deadly weapon enhancement allegation (§ 12022, subd. (b)(1)), as to Adrian; and two counts of assault with a deadly weapon (§ 245, subd. (a)(1)), one count as to each of Adrian and Jesus. It was further alleged Taylor had suffered a prior conviction for robbery, with a weapon-use enhancement, which constituted both a strike prior (§§ 667, subds. (b)-(i), 1170.12), and a serious felony prior (§ 667, subd. (a)).

The jury found Taylor guilty on all counts, fixed the degree of murder as first degree murder, and found true all the enhancement allegations. Taylor admitted the strike and serious felony prior allegations.

The trial court sentenced Taylor to prison for an indeterminate term of 64 years to life, and a determinate term of eight years.

Robles entered into a cooperation agreement with the prosecution, under which he agreed to plead guilty to voluntary manslaughter, with a possible sentence of 11 years, in exchange for agreeing to testify truthfully against Taylor.

## II. DISCUSSION

Taylor's defense at trial was that he acted in self-defense against the teens, whose intoxication caused them to be aggressive and belligerent. He maintains the trial court's jury instruction regarding voluntary intoxication

(CALCRIM No. 625) correctly informed the jury it could consider *his* intoxication in determining whether he possessed the requisite mental state for murder, but incorrectly informed the jury it could not consider *the teens'* voluntary intoxication in evaluating Taylor's self-defense claim. Based on our review of the appellate record, we conclude it is not reasonably likely the jury construed the instruction in the manner Taylor suggests.

## A. Background

### 1. Evidence of Intoxication

Evidence regarding Taylor's and the teens' voluntary intoxication on the night of the incident was admitted at trial without objection.

Robles testified he saw Taylor smoke methamphetamine on the day of the incident, and that it appeared Taylor was "high on meth" that night.

The prosecutor and defense counsel each questioned Adrian and Jesus extensively about the quantities of alcohol the teens drank and marijuana they smoked the night of the incident. The teens bought an 18-pack of beer, which they split equally, and one bottle of green apple vodka, which primarily Alan drank from. The teens also smoked two "bowls" of marijuana among the three of them. Adrian testified he felt "buzzed" and would not have been able to drive safely. Jesus testified he felt intoxicated.

The trauma surgeon who treated Alan testified that Alan had a blood alcohol level of .137 at the time of treatment. The trauma surgeon who treated Adrian testified that Adrian had a blood alcohol level of .187 at the time of treatment. There was no testimony regarding Jesus's blood alcohol level.

### 2. Closing Arguments

During closing arguments, the prosecutor and defense counsel discussed Taylor's and the teens' intoxication, without objection.

6

The prosecutor acknowledged there was evidence Taylor may have been under the influence of methamphetamine, but she argued his other conduct indicated the drug use did not prevent him from harboring the requisite mental state to be guilty of murder.

The prosecutor also acknowledged the teens were intoxicated, but argued the evidence did not support a finding that they were the initial aggressors.

Defense counsel discussed the teens' intoxication throughout his closing argument. He referenced the quantities of alcohol they drank and marijuana they smoked, and Alan's and Adrian's respective blood alcohol levels. He argued the teens "were drunk," "armed," and fueled by "liquid courage," which magnified their inherent sense of invincibility. He asked whether "a sober person [would] be aggressive, upset, and angry" just because somebody shined a flashlight at him from a distance.

Defense counsel also argued the teens' intoxication negatively affected their perception and recollection of events.

In her rebuttal argument, the prosecutor acknowledged but downplayed the significance of the teens' intoxication: "The defense spent a lot of time talking about how the teenagers were drinking. I don't think there's any dispute about that. Do you? [¶] It doesn't mean because these boys were drinking and smoking weed that they deserved to die. Because that's really what the question is. . . . Were they bothering anybody? Were they out to harass people? [¶] . . . . They [were] not looking for trouble, and they didn't want any trouble that night."

### 3. Jury Instructions

During the jury instruction conference, the trial court stated it intended to instruct the jury regarding voluntary intoxication with CALCRIM No. 625, which states (as ultimately given):

> "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill, or the defendant acted with deliberation and premeditation.

> "A person is *voluntarily intoxicated* if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect.

> "You may not consider evidence of voluntary intoxication for any other purpose."

Defense counsel did not object, and the trial court ultimately instructed the jury as indicated.[3]

The trial court also instructed the jury regarding provocation and its effect on the degree of murder (CALCRIM No. 522), justifiable homicide based on self-defense (CALCRIM No. 505), imperfect self-defense (CALCRIM No. 571), and heat-of-passion manslaughter (CALCRIM No. 570). The court admonished the jury to "[p]ay careful attention to all of these instructions and consider them together . . . ." (CALCRIM No. 200.)

---

[3] The Attorney General contends Taylor's failure to object to the instruction in the trial court forfeited the issue on appeal. "But . . . the forfeiture rule 'does not apply when . . . the trial court gives an instruction that is an incorrect statement of the law' " (*People v. Gomez* (2018) 6 Cal.5th 243, 312 (*Gomez*)), which is what Taylor contends occurred here. Accordingly, we address the merits of Taylor's claim.

## B. Legal Principles

"We review de novo the question of whether a jury instruction correctly states the law." (*People v. Quinonez* (2020) 46 Cal.App.5th 457, 465 (*Quinonez*), citing *People v. Posey* (2004) 32 Cal.4th 193, 218.) " ' "When an appellate court addresses a claim of jury misinstruction, it must . . . determine if there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner." ' " (*Gomez, supra*, 6 Cal.5th at p. 313.) In making this determination, " '[o]ur charge is to determine whether the trial court " 'fully and fairly instructed on the applicable law.' [Citation.]" [Citation.] We look to the instructions as a whole and the entire record of trial, including the arguments of counsel. [Citation.] Where reasonably possible, we interpret the instructions " 'to support the judgment rather than to defeat it.' " [Citation.]' " (*Quinonez*, at p. 465; see *People v. Young* (2005) 34 Cal.4th 1149, 1202; *People v. Martinez* (2017) 10 Cal.App.5th 686, 708.)

" '[A] jury instruction cannot be judged on the basis of one or two phrases plucked out of context . . . .' [Citation.] While a single sentence in an instruction 'may or may not be confusing, depending upon the context in which the sentence lies,' an instructional error ' " 'cannot be predicated upon an isolated phrase, sentence or excerpt taken from the instructions . . . .' " ' " (*Quinonez, supra*, 46 Cal.App.5th at pp. 465-466.) "Instead, ' "[t]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." [Citation.]' " (*Id*. at p. 466.)

## C. Analysis

Taylor properly acknowledges that the first two paragraphs of CALCRIM No. 625 correctly state the law with respect to a defendant's

9

voluntary intoxication.[4]  But he contends the final paragraph, which states, "You may not consider evidence of voluntary intoxication *for any other purpose*" (italics added), incorrectly "informed the jury that it could not consider evidence of the voluntary intoxication of **anyone other than the defendant**—including the teens—***for any purpose***," including to support a claim of self-defense.  This contention, based on "one . . . phrase[] plucked out of context" (*Quinonez, supra*, 46 Cal.App.5th at p. 465), does not withstand scrutiny.

First, even considered in isolation, the most reasonable reading of the reference to voluntary intoxication in CALCRIM No. 625's third paragraph is to the same voluntary intoxication referenced in the instruction's first paragraph:  "*the defendant's* voluntary intoxication."  (CALCRIM No. 625, italics added.)  The intervening second paragraph served only to define voluntary intoxication—it did not suggest the instruction might apply to anyone other than the defendant.

Second, the jury instructions, considered as a whole, support this construction.  (See *Quinonez, supra*, 46 Cal.App.5th at p. 465 ["[w]e look to the instructions as a whole"].)  In addition to instructing on voluntary intoxication, the court also instructed the jury on principles of provocation, self-defense, imperfect self-defense, and heat-of-passion.  More specifically, the court instructed the jury that the prosecution bore the burden of

---

4       The first two paragraphs of CALCRIM No. 625 track subdivisions (b) and (c) of section 29.4, which state:  "(b) Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought. [¶] (c) Voluntary intoxication includes the voluntary ingestion, injection, or taking by any other means of any intoxicating liquor, drug, or other substance."

disproving that Taylor acted in self-defense. In evaluating the reasonableness of Taylor's belief that he "was in imminent danger of being killed or suffering great bodily injury," the jury was instructed to "consider all the circumstances as they were known to and appeared to" Taylor. (CALCRIM No. 505.)

The unifying theme of these instructions is their focus on *the defendant's* state of mind and the reasonableness of *the defendant's* perceptions of "all the circumstances." (CALCRIM No. 505.) Considering all the instructions together, the jury likely would have also construed CALCRIM No. 625 as focusing on *the defendant's* voluntary intoxication.

Third, both the prosecutor and defense counsel introduced—without objection—extensive evidence regarding the teens' intoxication. Adrian and Jesus testified in detail about the amounts of alcohol they drank and marijuana they smoked, and the fact they felt "buzzed" or "intoxicated." Trauma surgeons also testified specifically as to Alan's and Adrian's respective blood alcohol levels. Because so much testimony concerning the teens' voluntary intoxication was elicited by both sides without objection, the jury would reasonably have understood it could consider this testimony *for something*.

Finally, " ' "any theoretical possibility of confusion [was] diminished by the parties' closing arguments." ' " (*People v. Lua* (2017) 10 Cal.App.5th 1004, 1013.) Taylor acknowledges on appeal that his trial counsel "spent a substantial portion of his closing discussing the evidence showing that the teens were drunk and high at the time of the fight." The prosecutor made the same observation during her rebuttal closing, stating: "The defense spent a lot of time talking about how the teenagers were drinking. I don't think there's any dispute about that. Do you?" She then argued that the teens'

11

intoxication did not mean they were "bothering" or "harass[ing] people" such that Taylor's conduct was justified. Counsels' extensive arguments addressing the teens' intoxication diminished any theoretical possibility that the jury would have mistakenly believed it could not consider the teens' intoxication.

In sum, in light of the challenged jury instruction (both in isolation and in context of the overall charge), the evidence adduced at trial, and counsels' closing arguments, we conclude it is not reasonably likely that the jury misconstrued CALCRIM No. 625 as precluding the jury from considering the teens' voluntary intoxication in evaluating Taylor's self-defense claim. (See *Gonzales v. Katavich* (C.D.Cal., Mar. 27, 2014, No. SA CV 13-1384-JGB (PJW) 2014 WL 1286315, at *6 ["It is clear from reading [CALCRIM No. 625] in context, including in the context of the other instructions and the lawyers' arguments to the jury, that the only limitation placed on the jury in considering intoxication was with regard to how [*the defendant*]'s intoxication impacted his ability to formulate the intent to murder the victim."], italics added.)

## III. DISPOSITION

The judgment is affirmed.

HALLER, J.

WE CONCUR:

HUFFMAN, Acting P. J.

GUERRERO, J.

12