Filed 2/16/24  In re T.J. CA4/2
Opinion following rehearing

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re T.J., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>T.J.,<br><br>        Defendant and Appellant. | E081349<br><br>(Super.Ct.No. J268952)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Charles J. Umeda, Judge.  Reversed.

Aurora Elizabeth Bewicke, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski and Brendon Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

1

In January 2017, T.J., who was 17 years old, was alleged to come within the jurisdiction of the juvenile court (Welf. & Inst. Code, § 602, subd. (a)), due to murdering (Pen. Code, § 187, subd. (a))[1] Rocky Holmes (the victim) in January 2016. In 2017, the juvenile court transferred the case to the criminal court. (Welf. & Inst. Code, § 707, subd. (a)(1).) In 2023, the criminal court transferred the case back to the juvenile court, and the juvenile court again transferred it to the criminal court. (Welf. & Inst. Code, § 707, subd. (a)(1).) T.J. contends the juvenile court erred by returning the case to the criminal court. We reverse.

## FACTS

A.    BACKGROUND

T.J. was born in March 1999. T.J. is a member of the Alley Boys street gang. In 2011, when T.J. was 12 years old, he admitted a misdemeanor battery allegation (§ 242), which was settled outside of court.[2] At 14 years old, T.J. admitted an allegation of fighting (§ 415, subd. (1)), which was again settled out of court. Approximately three months later, the juvenile court sustained a first-degree residential burglary (§ 459) allegation against T.J., declared him a ward of the court, and granted him probation. Less than three months after that, the juvenile court sustained an allegation that T.J. acted as an accessory after the fact (§ 32) to a robbery. The juvenile court ordered T.J. to serve 50 days in juvenile hall. In June 2014, when T.J. was 15

_____

[1] All subsequent citations will be to the Penal Code unless otherwise indicated.

[2] We infer that T.J. participated in an early intervention program, such as youth court, although it is unclear from the record. (Welf. & Inst. Code, §§ 601.5 & 654.)

years old, the juvenile court sustained an allegation that T.J. had possessed a firearm (§ 29610) and ordered him to serve 120 days in juvenile hall.

B.      MURDER ALLEGATION

The following has been alleged against T.J.:  In January 2016, T.J., Michion Darby (Darby)[3], and possibly a third person formed a plan to rob the victim, who sold marijuana.  T.J. or a coparticipant called the victim in order to schedule a meeting. When the victim arrived, T.J. asked, " 'Where's the weed at?'  The victim responded, 'Where's the money at?'  It was then [that T.J.] shot him."  T.J. shot the victim's right temple, abdomen, and right hip.  The victim died at the hospital.

C.      2017 TRANSFER TO CRIMINAL COURT

In January 2017, the San Bernardino County District Attorney filed a petition against T.J. in juvenile court, alleging murder, robbery, and other offenses.  In February 2017, the juvenile court, with the Honorable Pamela King presiding, ordered the case transferred to the criminal court.  Applying the preponderance of the evidence standard, the juvenile court concluded, "The choices made by [T.J.] have consistently reflected his commitment to pursuing a life of crime, such that he is not amenable to the care, treatment and training programs of the juvenile system."  The juvenile court dismissed the petition.  T.J. was transferred to the county jail.

---

[3] *People v. Darby* (Sept. 7, 2018, D073858) [nonpub. opn.].

3

D.     REINSTATEMENT OF THE JUVENILE PETITION

Effective in 2023, the Legislature changed the law regarding transferring juvenile cases to criminal court.  The change in the law requires juvenile courts to apply the clear and convincing evidence standard when determining whether a minor is amenable to rehabilitation in a juvenile facility.  (Assem. Bill No. 2361 (2021-2022 Reg. Sess.), ch. 1012, § 1; Welf. & Inst. Code, § 707, subd. (a)(3).)

In January 2023, the criminal court concluded that jeopardy had not yet attached in T.J.'s case.[4]  Therefore, the criminal court transferred T.J.'s case back to the juvenile court, and the juvenile petition from 2017 was reinstated so the clear and convincing standard of proof could be applied to the transfer determination.  At that point, T.J. was 23 years old and had been housed in the county jail for six years.

The probation department wrote a report to the juvenile court concerning whether T.J. would be amenable to treatment in juvenile hall if his case were to remain in the juvenile court and the allegations against him were found true.  The probation officer wrote, "Should [T.J.] be convicted of murder, he would only be under the Juvenile Court's jurisdiction until the age of 25, which is a little more than one year from now, as [T.J.] will turn 24 years old in six days."  Further, the probation officer reported, "[T.J.] has been terrorizing the county jail staff and inmates over the past six

---

**4**  A motion to transfer a case between juvenile and criminal court must occur before jeopardy has attached.  (Welf. & Inst. Code, §§ 707, subd. (a)(1) & 707.01, subd. (a)(3)(A).)  It is unclear what, if anything, happened in the criminal case between 2017 and 2023 because we have been provided with only the juvenile court record, not the criminal court record.

years. [T.J.] is fully indoctrinated and engaged in the life and politics of the adult county jail. He has been exposed to various types of adult criminals, participated in assaults, and initiated a riot." The probation officer recommended that the court follow the 2017 recommendation and again transfer the case to criminal court.

The juvenile court, with the Honorable Charles J. Umeda presiding, issued a written ruling transferring the case back to the criminal court. In the ruling, the juvenile court wrote, "In light of the seriousness of the charged offenses as committed the court determines that a commitment to a [secure youth treatment facility], Gateway to Arise[,] would be a possible option if [T.J.'s] case were to remain in the juvenile justice system. [T.J.] is currently twenty[-]four (24) years old. The Juvenile Court could retain jurisdiction over him until he is twenty-five (25) years old. The youth baseline term would be seven (7) years.

"Because of [T.J.'s] current age, the court believes that [T.J.'s] potential to grow and mature is limited. Furthermore, [T.J.]'s incarceration for approximately six years, acts of violence in county jail and lack of treatment while housed at county jail leads the court to conclude that he would require extensive rehabilitation over a long period of time for him to realistically be considered rehabilitated sufficiently for safe reentry into the community. At this time, if [T.J.] remains within the jurisdiction of the juvenile court, he would be committed to a secured youth treatment facility (SYTF) for less than a year before reaching his age of commitment. The court finds the evidence is clear and convincing that [T.J.] cannot be rehabilitated prior to the expiration of the juvenile court's jurisdiction."

5

## DISCUSSION

T.J. contends the juvenile court incorrectly believed it would have jurisdiction over T.J. only until he reached the age of 25 years. The People concede the juvenile court erred, but assert the error was harmless.

T.J. and the People are correct that the juvenile court erred in calculating the expiration of its jurisdiction. A juvenile court retains jurisdiction over a murderer until the murderer "attains 25 years of age, or two years from the date of commitment to a secure youth treatment facility . . . whichever occurs later, . . ." (Welf. & Inst. Code, § 607, subd. (c) [eff. through Sept. 12, 2023][5]; see also Welf. & Inst. Code, § 1769, subds. (b) & (d)(2).) Thus, the juvenile court would have had jurisdiction over T.J. until two years after committing him to a juvenile facility, if the allegations were found true.[6]

We examine whether the juvenile court's error was harmless. The People apply the standard found in *People v. Watson* (1956) 46 Cal.2d 818: Whether "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Id.* at p. 36) T.J. notes that the *Watson* standard does not require a finding that it is " 'more likely than not' " the result would have been different absent the error; rather, the standard requires " 'merely a reasonable chance,

---

[5] We use the version of the statute that was in effect at the time the juvenile court ruled and the parties briefed the issue in this court, as opposed to the version that became effective on September 13, 2023.

[6] The People contend that T.J. forfeited his contention by failing to raise it in the juvenile court. T.J. asserts that if he forfeited the issue, then he received ineffective assistance of counsel. We choose to address the merits of the issue.

more than an abstract possibility,' " that the result would have been different absent the error. (*People v. Hardy* (2021) 65 Cal.App.5th 312, 329-330, italics omitted.)

"In order to find that the minor should be transferred to a court of criminal jurisdiction, the [juvenile] court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (Welf. & Inst. Code, § 707, subd. (a)(3).) There is a statutorily enumerated list of factors for the juvenile court to consider in making its decision. (Welf. & Inst. Code, § 707, subd. (a)(3)(A)-(E).)

At oral argument in this court, T.J. asserted the law pertaining to fitness hearings (§ 707) changed in January 2024 and the case should be remanded for a hearing under the amended statute. The 2024 amendments to section 707 mandated that the juvenile court consider certain factors at a transfer hearing; previously, the statute was permissive, i.e., "may give weight to any relevant factor" was changed to "shall give weight to any relevant factor." The amendments also expanded the criteria within the "criminal sophistication" factor: "[T]he minor's involvement in the child welfare or foster care system; and the status of the minor as a victim of human trafficking, sexual abuse, or sexual battery." (§ 707, subd. (a)(3)(A)(iii); Sen. Bill No. 545 (2023-2024 Reg. Sess.) § 1.)

We focus on the factor of T.J.'s status as a victim of sexual abuse. The probation report reflects that T.J. "denie[d] being a victim of any type of abuse." The probation report was written in 2017 when T.J. was 17 years old. In August 2016, T.J. requested that his "aunt," J.N., be added to his visitor list in juvenile hall. Staff witnessed J.N.

7

"intimately kissing [T.J.] It was discovered she was his girlfriend and she was in her thirties." J.N. repeatedly visited T.J. and sent him letters, writing, " 'I miss you' and 'I love you' " on the envelopes. T.J. identified J.N. as his paternal aunt, while T.J.'s sister identified J.N. as a maternal aunt. When staff discovered the romantic relationship, "a Child Abuse Report was submitted to CFS." The victim was killed in January 2016; it is unclear if T.J. and J.N.'s romantic relationship began before or after the murder.

There is nothing in the juvenile court's ruling addressing the sexual interaction between J.N., who was in her thirties, and T.J., who was a minor. Given the juvenile court's misunderstanding of how long it could have jurisdiction over T.J. combined with the new sexual abuse factor that must be considered, there is a reasonable chance the juvenile court would issue a different ruling.[7] Accordingly, we will reverse so the juvenile court has the opportunity to reconsider the transfer motion under the amended law and with a clear understanding of its jurisdiction. (See *People v. Martinez* (2017) 10 Cal.App.5th 686, 718 [an unqualified reversal sets the motion at large in the juvenile court].)

---

[7] We express no opinion on whether the transfer motion should be granted or denied.

## DISPOSITION

The order is reversed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
Acting P. J.

We concur:

CODRINGTON
J.

MENETREZ
J.