Filed 2/26/26  P. v. Lopez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D084555 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. JCF005229) |
| JORGE LOPEZ, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Imperial County, Marco D. Nunez, Judge.  Affirmed.

Ariana D'Agostino, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Daniel Rogers and Adrian R. Contreras, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

Defendant Jorge Lopez pleaded no contest to one count of first degree robbery (Pen. Code,[1] § 211) and admitted a firearm-use enhancement (§ 12022.53, subd. (b)) in connection with his robbery of two technicians who worked for National Cash Register (NCR) while they were servicing an automated teller machine (ATM) owned by Wells Fargo Bank (Wells Fargo). Wells Fargo claimed Lopez stole $201,950 in cash from the ATM. The trial court sentenced Lopez to 14 years in prison, ordered him to pay $201,950 in victim restitution to Wells Fargo, and reserved restitution as to NCR.

On appeal, Lopez contends the trial court abused its discretion in determining the amount of victim restitution owed to Wells Fargo. Further, Lopez asserts the trial court erred in failing to properly determine whether NCR was a victim, and if so, how to allocate the restitution award between NCR and Wells Fargo. To the extent Lopez preserved these claims for appellate review, we conclude the trial court acted within its discretion in its handling of victim restitution. Accordingly, we affirm the order.

# II. BACKGROUND

## A. Factual Background[2]

On January 14, 2021, two NCR technicians were servicing a drive-up ATM owned by Wells Fargo. The technicians noticed a suspicious white van and Hummer SUV in the parking lot but remained focused on their work.

---

[1] Further statutory references are to the Penal Code unless otherwise indicated.

[2] We base our factual summary on the preliminary hearing transcript, which defendant stipulated would establish the factual basis for his plea, and the probation officer's report, which "the trial court is entitled to consider" when ordering victim restitution. (See *People v. Gemelli* (2008) 161 Cal.App.4th 1539, 1543 (*Gemelli*).)

Lopez approached the technicians from one side holding a handgun, and an accomplice approached the technicians from the other side. Lopez ordered the men to hand over their belongings and the money in the ATM. One technician, Grant E., handed over his company-owned cellphone, his work keys, and his personal cellphone. The other technician, Tim R., handed over his company-owned cellphone, his work keys, and his wallet.

The technicians also handed over four "cassettes" (plastic containers that hold the cash in the ATM). Three cassettes contained $20 bills and one contained $50 bills. Tim initially told police he believed the cassettes held a total of $40,000, but he testified at the preliminary hearing that, "after thinking about it," he believed based on the number of cassettes and the fact that "the armored truck had just been there earlier that day" that there was "anywhere between 120- and . . . 140,000 [dollars]." Grant testified he "didn't have any information on the amount of money in the ATM . . . , but from the weight, it was a substantial amount." The police detective assigned to the case testified at the preliminary hearing that although "it was [initially] reported about $40,000 was taken from the ATM, . . . the amount later turned out to be about $201,000."

Lopez and the other robber fled in the white van, followed closely by the Hummer. Police later found the vehicles, both of which had been reported stolen. In the van, police found two ATM cassettes and $220 in cash (eleven $20 bills).

The robbery was captured by security cameras. Tim testified at the preliminary hearing that he was "100 percent" positive Lopez was the robber with the gun. The detective testified that Lopez appeared to be the person with the gun in the security camera footage.

## B. Charges, Plea, and Sentence

Lopez was charged with two counts of first degree ATM robbery (one as to each technician) (§ 211), two counts of second degree robbery (one as to each technician) (§ 211), one count of receiving a stolen vehicle (the white van) (§ 496, subd. (d)), one count of driving or taking a vehicle without consent (the white van) (Veh. Code, § 10851, subd. (a)), and one count of possession of a firearm by a felon (§ 29800, subd. (a)(1)). All the robbery counts carried firearm-use enhancement allegations. (§ 12022.53, subd. (b).)

As part of a plea deal, Lopez pleaded no contest to one count of first degree robbery and admitted the attached firearm allegation, in exchange for a stipulated 14-year prison sentence (four years for the robbery, 10 years for the firearm enhancement).[3] The People dismissed the remaining counts. Lopez stipulated that the court "may refer to the preliminary [hearing] transcript and underlying police reports . . . , which establish a factual basis for [the] plea."

At the sentencing hearing, the trial court imposed the stipulated 14-year sentence.

## C. Victim Restitution Proceedings

In connection with the sentencing hearing, the probation officer submitted a report that itemized the victim restitution each victim was seeking. Tim was not seeking any. Grant was seeking $1,300 for his personal cellphone. Wells Fargo was seeking $201,950 (according to an email from a Wells Fargo "Security Agent"). The probation officer, unable to reach an NCR representative, requested that the court reserve on restitution as to

---

[3]     Lopez entered his pleas on February 26, 2024.

NCR. The probation officer recommended that the court grant the requested victim restitution as to Grant and Wells Fargo.

At the March 18, 2024 sentencing hearing, Lopez "submit[ted] on the report . . . with the exception of restitution" requested by Wells Fargo. The prosecutor explained to the court that Lopez wanted a restitution hearing and "more documentation establishing the $201,000 figure, which we'll be able to do." The court awarded $1,300 in victim restitution to Grant; reserved on restitution as to Wells Fargo and set a restitution hearing; and ordered that restitution as to NCR would "be determined by subsequent order on a motion of the People or the victim, as the court has insufficient information to support making a restitution order at this time."

Before the restitution hearing, on April 19, 2024, the People filed a brief supporting Wells Fargo's $201,950 restitution request. The brief informed the trial court that the People had "subpoenaed records from Wells Fargo showing the amount stolen" and further advised that the court had received on April 12, 2023 (about a year earlier) responsive records "documenting the amount taken from the ATM." The People attached to their brief a two-page "view cash sheet" (hereafter, the cash sheet) from Wells Fargo's "ATM Balancing" department.

The cash sheet shows a "Created Date" of January 20, 2021; a "Balance Date" as of January 15, 2021 (the day after the robbery); and a "Last Bal Date" of January 13, 2021 (the day before the robbery). Under the heading "*CASH STATUS*," the cash sheet shows "Beginning Cash" of $220,000. A few columns to the right, under the heading "*CCD ESTIMATION*," the amount "$201,950.00" appears.[4] The same dollar amount appears nine times in

---

4       We note the cash sheet does not include a legend or glossary explaining the meaning of its headings or entries.

5

different entries on the cash sheet. Under the heading "*TOTAL CASH DISPENSE*," the cash sheet has an entry for "Total EE/CR" of $36,100. Another entry under this heading, "Total Cash Dispense," has no number next to it. At the end of the second page of the cash sheet, a "Comments" section includes the following note: "NCR robbery ATM cash shortage of $201,950.00."

About two weeks after the People filed their restitution brief, a probation officer filed a memorandum (the probation memo) relating the officer's communications with Wells Fargo personnel about documenting Wells Fargo's $201,950 restitution request. Letters mailed to Wells Fargo at "Financial Crimes Investigation" and "Fraud" addresses elicited no response. Email and telephone calls to the security agent who initially advised the probation officer about the amount of Wells Fargo's loss were undeliverable or automatically disconnected. The probation officer eventually reached a member of Wells Fargo's corporate security team by phone. This employee "explained after looking in their system that the only note he was able to read was the previous amount of $201,950 that had been" submitted to the probation department. The employee connected the probation officer with Wells Fargo's lead corporate security officer, who explained via email that "he could not decipher the reason for the request for the amount of $201,950." This employee acknowledged that "he believe[d] the initial loss mentioned in the report was $40,000[,] but after looking into the matter more in depth their department determined the total loss was $201,950." The employee said he would pass along to his manager the probation officer's request for additional substantiation, but the probation officer never heard anything further.

6

The court held a restitution hearing on June 10, 2024. At the outset, the court stated that the probation memo indicated "there is somewhat . . . of an issue because . . . the memo does reflect that there's some documentation that's still pending." The prosecutor clarified that the documentation — the cash sheet — was obtained via subpoena and that the probation department "actually put the documentation in [a] memo" filed "in [a] co-defendant's case." The court responded that it "remember[ed] the case" and "the number does appear to be in line with [the court's] review of the case." When the court asked the prosecutor to file the documentation in *this* case, the prosecutor responded that it was submitted with the People's restitution brief.

Looking at the cash sheet, the court found that the comment noting the robbery caused an "ATM cash shortage of $201,950" was "enough" to establish Wells Fargo's claim and to shift the burden to the defense.

Defense counsel responded that the probation memo showed that "Wells Fargo was less than fully cooperative." As to the cash sheet, counsel said he had the following "problem[s]": "[T]he claim initially was approximately $40,000 [and then] jumped up to $201,950. And this cash sheet doesn't even include a declaration of what the numbers mean or how they were derived. And I just think it is insufficient because it's not been authenticated. There's no foundation."

The prosecutor replied that he "specifically subpoenaed Wells Fargo for the amount that was taken on [the day of the robbery], and [the cash sheet] is what they provided." With that, the parties submitted.

Citing the cash sheet, the trial court ordered Lopez to pay Wells Fargo victim restitution in "the amount that's being requested, $201,950."

When the court sought to confirm that it had addressed all outstanding victim restitution requests, the clerk reminded the court that it had reserved on the issue as to NCR. The prosecutor clarified, "There's some sort of relationship between Wells Fargo and [NCR], which I don't know about." The court "reserve[d] on [NCR]," but observed that "it seems like ordering . . . restitution to Wells Fargo renders that . . . victim moot." Defense counsel did not address the court regarding NCR.

### III. DISCUSSION

Lopez appeals the trial court's handling of victim restitution as to both Wells Fargo and NCR. As to Wells Fargo, Lopez contends the court abused its discretion in awarding $201,950 because the amount is unsupported by substantial evidence and creates a "windfall" because the court did not deduct the $220 in cash that police recovered from the getaway vehicle. As to NCR, Lopez contends "the trial court erred when it failed to identify each victim and each loss to which it pertains." To the extent Lopez preserved these challenges, we reject them and affirm the trial court.

#### A. Relevant Legal Principles

"Restitution is constitutionally and statutorily mandated in California." (*People v. Keichler* (2005) 129 Cal.App.4th 1039, 1045; see Cal. Const., art. I, § 28, subd. (b)(13)(A); *People v. Giordano* (2007) 42 Cal.4th 644, 655 (*Giordano*) [noting the "broad constitutional mandate" for victim restitution]; see also § 1202.4, subd. (f).)

As relevant here, section 1202.4, subdivision (f), provides that, "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other

8

showing to the court." "A corporation . . . or any other legal or commercial entity" can be a " 'victim' " for purposes of restitution. (§ 1202.4, subd. (k)(2).)

"The standard of proof at a restitution hearing is preponderance of the evidence." (*People v. Grandpierre* (2021) 66 Cal.App.5th 111, 115 (*Grandpierre*); accord, *People v. Millard* (2009) 175 Cal.App.4th 7, 26 (*Millard*).) "[T]he People carry the initial burden of demonstrating the amount of the victim's economic loss." (*People v. Selivanov* (2016) 5 Cal.App.5th 726, 788.) " ' " "[S]entencing judges are given virtually unlimited discretion as to the kind of information they can consider' " ' in determining victim restitution." (*People v. Phu* (2009) 179 Cal.App.4th 280, 283.) "[T]he trial court is entitled to consider the probation report, and, as prima facie evidence of loss, may accept a property owner's statement made in the probation report about the value of stolen or damaged property." (*Gemelli*, *supra*, 161 Cal.App.4th at p. 1543; see *Grandpierre*, at p. 115 ["A victim's statement of economic loss is prima facie evidence of loss."]; *People v. Kelly* (2020) 59 Cal.App.5th 1172, 1183 (*Kelly*) ["the standard of evidence at a restitution hearing does not necessarily require a crime victim to produce detailed billing records, receipts, or business invoices"].) "[T]he court in making a restitution order is not required to determine the 'exact amount of loss,' so long as it employs 'a rational method that could reasonably be said to make the victim whole,' and is not 'arbitrary and capricious.' " (*In re K.F.* (2009) 173 Cal.App.4th 655, 666; see *People v. Carbajal* (1995) 10 Cal.4th 1114, 1121 (*Carbajal*) ["[t]here is no requirement the restitution order be limited to the exact amount of the loss"].)

"Once the victim makes a prima facie showing of economic losses incurred as a result of the defendant's criminal acts, the burden shifts to the defendant to disprove the amount of losses claimed by the victim. [Citation.]

9

The defendant has the burden of rebutting the victim's statement of losses, and to do so, may submit evidence to prove the amount claimed exceeds the repair or replacement cost of damaged or stolen property." (*Gemelli, supra,* 161 Cal.App.4th at p. 1543; see *Grandpierre, supra,* 66 Cal.App.5th at p. 115 ["To rebut a prima facie case, the defendant has the burden to disprove the amount of losses the victim claimed."].)

"The trial court has substantial discretion to determine which party met their respective burdens." (*Kelly, supra,* 59 Cal.App.5th at p. 1183.)

" 'The standard of review of a restitution order is abuse of discretion. "A victim's restitution right is to be broadly and liberally construed." [Citation.] " 'Where there is a factual and rational basis for the amount of restitution ordered by the trial court, no abuse of discretion will be found by the reviewing court.' " ' " (*Millard, supra,* 175 Cal.App.4th at p. 26; *Giordano, supra,* 42 Cal.4th at p. 665 ["an award of restitution is committed to the sound discretion of the trial court"].) " 'In reviewing the sufficiency of the evidence [to support a factual finding], the " 'power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the trial court's findings." ' " (*Millard,* at p. 26.) " 'We do not reweigh or reinterpret the evidence; rather, we determine whether there is sufficient evidence to support the inference drawn by the trier of fact.' " (*Ibid.*) "[W]e presume that a judgment or order of the trial court is correct, ' "[a]ll intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown." ' " (*Giordano,* at p. 666.)

## B. Analysis

### 1. The Trial Court Acted Within Its Discretion in Ordering Lopez to Pay Wells Fargo $201,950 in Victim Restitution

We conclude the trial court acted within its discretion in ordering Lopez to pay Wells Fargo $201,950 in victim restitution because substantial evidence supports the order.

To begin, Wells Fargo employees repeatedly stated that the bank had determined that the amount of its loss was $201,950. The assigned detective testified at the preliminary hearing that although "it was [initially] reported about $40,000 was taken from the ATM, . . . the amount later turned out to be about $201,000."[5] The probation officer's presentencing report stated that a Wells Fargo security agent sent an email itemizing the loss as $201,950. The probation memo filed in connection with the restitution hearing also related that several Wells Fargo employees reported that the company had determined the amount of the loss was $201,950. These statements — conveying a national bank's assessment of the financial loss caused by the theft of cash from one of its ATMs — was sufficient to establish a prima facie showing of Wells Fargo's entitlement to the claimed amount. (See *Gemelli*, *supra*, 161 Cal.App.4th at p. 1543; *Grandpierre*, *supra*, 66 Cal.App.5th at p. 115.) No further documentary proof was required. (See *Kelly*, *supra*, 59 Cal.App.5th at p. 1183.)

Nevertheless, the People supported Wells Fargo's restitution request with additional evidence — the cash sheet, which Wells Fargo produced in

---

[5] The initial $40,000 estimate likely came from Tim's report to police at the time of the robbery. But Tim clarified at the preliminary hearing that he had reassessed based on the number of cassettes and the recent armored truck visit that the amount was probably closer to $120,000 to $140,000.

response to the prosecutor's subpoena for records substantiating Wells Fargo's restitution request. The "Comments" section expressly states that Wells Fargo determined that the ATM "robbery" caused a "cash shortage of $201,950.00." That same amount appears in nine other places on the cash sheet. The trial court could reasonably rely on the cash sheet as further validation of Wells Fargo's request.

Lopez challenges the cash sheet as being "ambiguous." We are not persuaded that any ambiguities undermine the trial court's restitution order. Lopez's first complaint about the cash sheet is that several entries are irrelevant because they are dated "prior to the commission of the crime" "on January 24, 2021." But the record shows that the crime occurred on January 14, 2021 (not January 24), thus undermining Lopez's point. Moreover, we note that the cash sheet's balance entries bookend the January 14 robbery date — the "Balance Date" is January 15 (the day after the robbery) and the "Last Bal Date" is January 13 (the day before the robbery).

Second, Lopez posits that the cash sheet shows that Wells Fargo's actual loss may only have been $183,900 because the sheet shows a "Beginning Cash" amount of "$220,000" and a $36,100 entry under the heading "*TOTAL CASH DISPENSE*." In other words, a starting balance of $220,000 minus $36,100 in dispensed cash results in $183,900 remaining in the ATM at the time of the robbery. But as Lopez acknowledges, there is "no explanation of the numbers" in these categories. In addition, although the $36,100 entry appears under the heading "*TOTAL CASH DISPENSE*," it appears next to the undefined entry for "EE/CR." By contrast, under the same heading, the entry for "Total Cash Dispense" is blank. Therefore, Lopez's suggestion that the $36,100 entry reflects ATM withdrawals that

12

should have been subtracted from the $220,000 starting balance (for a net balance of $183,900 at the time of the robbery) is entirely speculative.

In any event, Lopez introduced no affirmative evidence of his own to undermine Wells Fargo's prima facie showing. (See *Gemelli, supra,* 161 Cal.App.4th at p. 1543 ["The defendant has the burden of rebutting the victim's statement of losses, and to do so, may submit evidence to prove the amount claimed exceeds the [loss]."].)

For these reasons, we conclude the trial court acted within its discretion in finding Lopez failed to overcome Wells Fargo's prima facie showing of the amount of its loss.

As a separate argument, Lopez contends the trial court erred by failing to deduct $220 — the amount of cash recovered from the getaway van — from the $201,950 award. This argument fails for several reasons. First, Lopez forfeited this fact-specific argument by failing to raise it in the trial court where the court and parties could have explored where the $220 came from and what became of it. (See *People v. Martinez* (2017) 10 Cal.App.5th 686, 721–722 (*Martinez*) [holding that the defendant's claims that the victim "incorrectly calculated the amount of restitution due him by subtracting" a lesser amount of money than "was actually returned to him, . . . are purely factual issues that are susceptible to [forfeiture]"].) Second, as stated, Lopez adduced no *evidence* showing that the $220 recovered from the van came from the ATM. Without this evidence, there was no basis for the trial court to deduct $220 from the restitution award. Third, even if there were evidence that the recovered cash came from the ATM, the trial court could reasonably have inferred that the recovered cash was returned to Wells Fargo and was accounted for in Wells Fargo's calculation of its loss from the robbery. Finally, as Lopez acknowledges, the trial court's calculation need not be

"exact." (See *In re K.F.*, *supra*, 173 Cal.App.4th at p. 666; *Carbajal*, *supra*, 10 Cal.4th at p. 1121.) Here, assuming Lopez is correct about the $220 discrepancy, the court's restitution order is still *99.9 percent* precise (i.e. $220 is only about 0.11 percent of $201,950).

## 2. Lopez Forfeited His Challenges as to NCR

Lopez also contends the trial court erred by "reserve[ing] restitution as to NCR without (1) determining if NCR constituted a victim . . . and (2) determining proper allocation of the restitution between NCR and Wells Fargo." (See § 1202.4, subd. (f)(3) ["To the extent possible, the restitution order shall . . . identify each victim and each loss to which it pertains."].)

Lopez forfeited these challenges by failing to raise them in the trial court. The probation officer's presentencing report identified NCR as a victim and recommended that the court reserve on restitution as to NCR. Lopez submitted on the report at the sentencing hearing (except as to Wells Fargo) and raised no objections as to NCR. At the restitution hearing, the clerk reminded the court it had reserved restitution as to NCR and the court again reserved on the issue without objection from Lopez. Having twice failed to object when the issue was before the trial court, Lopez cannot raise it now for the first time on appeal. (See *Martinez*, *supra*, 10 Cal.App.5th at pp. 721–722.)

## IV.  DISPOSITION

The order is affirmed.

RUBIN, J.

WE CONCUR:

O'ROURKE, Acting P. J.

KELETY, J.